**In re John J. BONES, and Roberta E. Bones, Debtors.**

**Joel Willens, and Linda Willens, Plaintiffs,**

**v.**

**John J. Bones, Defendant.**

**Bankruptcy No. 01–43307.**
**Adversary No. 01–4868.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

Sept. 30, 2008.

Charles J. Gerlach, Michael J. Lebow, West Bloomfield, MI, for Plaintiffs.

Thomas Elkins, Canton, MI, for Defendant.

## TRIAL OPINION

THOMAS J. TUCKER, Bankruptcy Judge.

In this adversary proceeding, Plaintiffs Joel and Linda Willens seek a judgment against Defendant John Bones of more than $482,000, plus attorney fees and costs, and a determination that this debt is not dischargeable in Mr. Bones's Chapter 7 bankruptcy case, under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

The Court conducted a bench trial spread over 20 days, amounting to the equivalent of roughly 18 full days of trial time. This opinion states the Court's findings of fact and conclusions of law.

For the reasons stated in this opinion, the Court finds for Defendant John Bones. The Court concludes that even though Bones did make several misrepresentations to Plaintiffs, any actual reliance by Plaintiffs on the misrepresentations was neither justifiable nor reasonable. As a result, the debt at issue is not nondischargeable under either § 523(a)(2)(A) or § 523(a)(2)(B).

## I. Jurisdiction and venue

The Court has subject matter jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b), and the United States District Court's Local Rule 83.50(a)(E.D.Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Venue is proper under 28 U.S.C. § 1409(a), and is not disputed.

## II. Procedural history

The Plaintiffs Joel Willens and Linda Willens are husband and wife. They filed their Complaint in this case along with another plaintiff, J.M. Willens Corporation, a corporation owned by Joel Willens.[1] Plaintiffs originally stated three counts against Defendant John J. Bones and his wife, Roberta Ellen Bones. John and Roberta Bones are debtors in the main bankruptcy case, a voluntary Chapter 7 case, and each has received a discharge.[2]

The claims and parties in Plaintiffs' Complaint were narrowed before trial. By stipulation and order, Count III of Plaintiffs' Complaint, objecting to the Defendants' discharge under 11 U.S.C. § 727(a)(4)(A), was dismissed, and all claims against Defendant Roberta Bones were dismissed.[3] Also before trial, Plaintiffs abandoned the portion of the nondischargeability claim in Count I of their Complaint based on 11 U.S.C. § 523(a)(6). Finally, during trial, and as clarified by Plaintiffs' counsel during closing argument, all claims by Plaintiff J.M. Willens Corporation were abandoned.

This leaves for determination the claims of Plaintiffs Joel Willens and Linda Willens against Defendant John Bones, under Counts I and II of their Complaint. These Plaintiffs seek a money judgment and a determination that the debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

The Defendants filed counterclaims, stating claims for damages under theories of breach of contract, negligence, breach of warranty, fraud, and breach of an unspecified "Consumer Protection Act."[4] The Court later dismissed all of the counterclaims, on the ground that the Defendants did not have standing to assert any of the claims, which arose before the filing of Defendants' Chapter 7 bankruptcy case. Rather, the Court held that those counterclaims were property of the Debtors' bankruptcy estate, and that only the Chapter 7 trustee had standing to pursue them.[5] The Chapter 7 trustee later chose not to litigate the claims, but instead sold the claims at an auction, under procedures approved by the Court.[6] Plaintiffs Joel and

---

1. Complaint, Docket # 1.

2. Docket # 167 in Case No. 01–43307.

3. Docket # 59.

4. Docket # 3.

5. *See* Order Granting Plaintiff Willens's Motion to Dismiss Counterclaim ... for Lack of Standing, Docket # 31. This ruling was made by visiting Bankruptcy Judge Burton M. Perlman, of the Southern District of Ohio, acting as a visiting judge. This adversary proceeding was originally assigned to visiting Judge Perlman, and later reassigned to the undersigned judge. *See* Order, Docket # 38.

6. *See* Stipulated Order Granting Trustee's Motion to Compromise, Docket # 146 in Case No. 01–43307.

Linda Willens were the successful bidders, and of course they made no attempt to assert any of the counterclaims against themselves. But John Bones has asserted the substance of the counterclaims as affirmative defenses.

## III. Facts

The Court finds the following facts, based on a review of all of the evidence presented at trial—*i.e.,* all of the testimony and exhibits admitted into evidence—and the Court's assessment of the credibility and reliability of the witnesses and of their testimony.[7]

### A. Background

Plaintiff Joel Willens is the sole owner of Plaintiff J.M. Willens Corporation, and through that corporation provides design and construction services for light commercial and residential buildings. Joel Willens has done this work for more than 30 years, has a Bachelor of Science degree in architectural engineering, and is a licensed builder.[8] Plaintiff Linda Willens has a Ph.D. in psychology, and is a practicing psychologist and marriage counselor.[9]

Joel Willens first met Defendant John Bones in 1998, a few months after the Bones's home was severely damaged by a storm on Memorial Day Weekend 1998.[10]

On October 5, 1998, John Bones and his wife entered into a Construction Management Agreement with J.M. Willens Corporation.[11] Under the Agreement, J.M. Willens Corporation was to provide construction management and supervision services, for repairs and renovations to the Bones's home, in exchange for a stated fee.[12] Bones obtained substantial funding for this project from a combination of loans and homeowners' insurance proceeds.[13]

Work began on the Bones's home under the Construction Management Agreement soon after it was entered, and continued, with some interruptions, until March 2000. During most of this time, Joel Willens and John Bones worked closely together on the project, generally meeting on a weekly basis, and were on friendly terms.[14]

### B. The Willens's $130,000 loan to SCSW, Inc.

At all relevant times, John Bones was the President and 75% shareholder of a corporation named SCSW, Inc. (SCSW), which was located in Imlay City, Michigan.[15] SCSW manufactured steel racks for sale to the automotive industry. General Motors Corporation was SCSW's largest customer, accounting for some 90% of

---

7. Because of the length of the trial and the voluminous nature of the record, the Court cannot discuss all of the evidence in this opinion. Nor is it necessary to do so in order for the Court to reach and explain its decision.

8. Testimony of Joel Willens. This opinion will cite testimony of trial witnesses by giving their last name, after the initial citation which gives the witness's full name. For example, a citation to the testimony of Joel Willens will be stated as "Willens." To avoid confusion, the testimony of Linda Willens will be cited as "Linda Willens." Trial exhibits will be cited in abbreviated form as "PX——" and

"DX——" for Plaintiffs' exhibits and Defendant's exhibits respectively.

9. Testimony of Linda Willens.

10. Testimony of John Bones.

11. DX–LL; Bones; Willens.

12. DX–LL at p. 1.

13. Bones.

14. Willens; Bones.

15. Bones.

SCSW's business.[16] Beginning at least as early as Summer 1999, John Bones was seeking one or more new investors or a lender for SCSW, to inject new funding into the company, because of financial problems the company was having. In August and September 1999, Bones began focusing on Joel Willens as a possible investor or lender. Bones and Willens had a number of discussions about this, including a meeting on September 16, 1999.[17]

Eventually, Joel and Linda Willens decided to lend money to SCSW, up to $200,000, with John Bones to personally guarantee the loan. Joel Willens retained an accountant and investment advisor, John Solomon, and an attorney, Michael Beals, to represent and advise him in the transaction.[18] Ultimately, a loan closing date of November 19, 1999 was chosen.

On November 11, 1999, eight days before the November 19, 1999 closing, John Bones asked Joel Willens to make a $50,000 advance on the contemplated loan. Bones told Willens that he urgently needed the $50,000 to cover SCSW expenses, to pay some urgent bills that had to be paid that day. Willens made the loan advance that day with the understanding that this advance would be repaid out of the proceeds of the upcoming loan closing.[19]

At the November 19, 1999 loan closing, the Willenses decided to fund only $130,000 of the originally-contemplated $200,000 loan to SCSW. This was done by means of two checks. The first was a personal check from the Willenses payable to SCSW in the amount of $50,000; the second was a bank check purchased by the Willenses in the amount of $80,000, also payable to SCSW.[20] The first of these checks, for $50,000, was immediately indorsed by SCSW, through John Bones, President, to Joel Willens.[21] This was done in order to repay Joel Willens for the November 11 loan advance of $50,000.[22]

As part of the loan closing, SCSW, through John Bones, signed a Promissory Note (the "SCSW Promissory Note") and a Security Agreement, in which SCSW granted the Willenses a security interest

16. Bones; Willens.

17. Willens; Bones; DX–S (Joel Willens's notes about the meeting).

18. Willens.

19. Willens.

20. Willens; PX–17.

21. *Id.* (front and back of check # 102).

22. Willens. The November 11 loan advance from Joel Willens to SCSW was made in a rather convoluted fashion, at the request of John Bones, and this led to some confusion and dispute in the testimony at trial. The loan advance was made through a check payable to John Bones and drawn on the account of J.M. Willens Corporation. The check bore the notations "Bones House" and "Reimb of Const Cost." PX–12. The funds for this $50,000 loan advance, however, came entirely from personal funds of Joel and Linda Willens. Joel Willens used the J.M. Willens Corporation checking account and Jones Bones, check payee, as conduits to advance $50,000 to and for the benefit of SCSW. And Bones used the proceeds to pay expenses of SCSW. This was all done at the request of John Bones, and by agreement of John Bones and Joel Willens, the parties considered this a $50,000 loan advance to and for the benefit of SCSW from Joel Willens personally, to be repaid (essentially, refinanced) out of the November 19 loan closing proceeds. These findings are supported by the testimony of Joel Willens, which the Court credits, and by the following documents from the November 19 loan closing: the $50,000 check payable to SCSW, drawn on the personal account of Joel and Linda Willens, which contained a Memo stating: $130,000.00 total loan to date;" and the "Closing Agreement" signed by Joel Willens and SCSW (by John Bones, its President) at the November 19 closing (p. 1 Recital B, stating that the Willenses had that day loaned $130,000 to SCSW).

in essentially all of its assets.[23] This security interest was junior in priority to the security interest of SCSW's secured lender, Cotpar Trading Ltd. In November 1999, SCSW owed Cotpar about $1.3 million.[24] As additional security, for Bones's Guaranty of the SCSW debt, John Bones and his wife gave Joel and Linda Willens a second mortgage in the Bones's vacation home in Sanilac County, Michigan.[25]

## C. SCSW's Chapter 11 bankruptcy and the Willens's $25,000 loan

From at least Spring 1999 forward, SCSW had financial problems which continued to worsen.[26] It fell into default on its loan agreements with Cotpar, by failing to make timely payments to Cotpar and by falling out of formula on its line of credit with Cotpar.[27] In a letter dated September 13, 1999, Cotpar declared SCSW in default on its loans, and began charging a higher, default rate of interest under its loan agreements.[28]

Less than two weeks after Joel and Linda Willens closed their $130,000 loan to SCSW on November 18, 1999, Cotpar delivered a letter to SCSW declaring further defaults by SCSW and accelerating the entire balance of its loans. Cotpar also exercised its rights under a "dominion of funds" agreement, and demanded that SCSW convey to Cotpar all of its accounts receivable and their proceeds.[29] Cotpar's November 30, 1999 letter asserted that SCSW had defaulted not only by failing to make timely payments, by also by making "substantial misrepresentations on recent borrowing certificates with regard to both eligible inventory which has been falsely inflated and eligible accounts receivable which have included non-existent fictional items." [30]

On December 1, 1999, Cotpar filed suit against SCSW in the Macomb County, Michigan Circuit Court and obtained a temporary restraining order, enjoining SCSW from collecting any accounts receivable from General Motors, and from using the proceeds of any accounts receivable paid by General Motors.[31] Cotpar effectively obtained control of SCSW's cash flow. SCSW continued to operate, but it could spend money only with Cotpar's approval, on a daily-budget basis.[32]

In January 2000, John Bones and Joel Willens met with bankruptcy counsel, and ultimately Bones and Willens agreed that SCSW should file a Chapter 11 bankruptcy. At Bones's request, Joel and Linda Willens loaned a total of $25,000 to SCSW on January 13, 2000, to enable SCSW to pay its bankruptcy counsel a retainer, which counsel required in order to file the bankruptcy case.[33]

SCSW filed its Chapter 11 bankruptcy petition on January 13, 2000, in this Court. (Case No. 00–40486.) The business did not survive. Ultimately, a liquidating Chapter 11 plan was confirmed, and

---

23. DX–B and DX–C.

24. *See* DX–AAAA at 1 (showing balances owed on SCSW Note and SCSW line of credit), PX–18, ¶ 3.

25. DX–D.

26. Bones.

27. PX–4.

28. *Id.*

29. PX–18.

30. *Id.* at ¶ 1.

31. DX–NNNN at p. 2.

32. Bones.

33. DX–P.

SCSW was liquidated. The bankruptcy case was closed on February 26, 2003.[34]

### D. The unpaid loan balance and other damages claimed

As recounted above, Joel and Linda Willens loaned a total of $155,000 to SCSW. SCSW made one monthly interest payment, on December 18, 1999, in the amount of $1,300.00. The only other payments made on the loans were made on August 9, 2000 and December 20, 2000, in the amounts of $8,700.00 and $4,545.00, respectively. These payments came from proceeds of post-bankruptcy auction sales of SCSW property.[35]

The SCSW Promissory Note, which by its terms applies to the February 13, 2000 loan advance of $25,000 as well as the initial loan of $130,000, provides for interest at the rate of 12% per annum, and at the rate of 15% per annum after the loan matures or is accelerated upon an event of default.[36] The Note also requires SCSW, "and any Guarantor" of the Note, to pay all costs incurred by the Willenses in the collection of the Note, including reasonable attorney fees.[37] At closing argument, Plaintiffs' counsel presented a chart from which he argued that the unpaid balance owing by Bones under his personal guaranty was $482,876.95 as of December 31, 2007, including interest, plus attorney fees and costs. Plaintiffs also claim that they are entitled to additional damages for other injuries caused by John Bones's fraud, including damages for emotional distress and damage to the Plaintiffs' marriage.

### E. The alleged fraudulent misrepresentations by John Bones

Joel and Linda Willens claim that John Bones fraudulently induced them to make the loans to SCSW, by intentionally making numerous false representations, and by knowingly failing to disclose facts that Bones had a duty to disclose. This was done, Plaintiffs claim, all with the intent to deceive them into believing that the loans to SCSW were much less risky than they actually were. These misrepresentations are discussed in detail, below.

#### 1. Bones's conduct in concealing invoices received by SCSW during the Summer and Fall of 1999, in order to artificially reduce the amount of accounts payable in the SCSW financial reports

During the Summer and continuing into the Fall of 1999, as John Bones sought to bring in one or more new investors who could contribute capital, or lenders who would lend new money to SCSW,[38] Bones tried to attract Joel and Linda Willens as investors or lenders. Bones had many discussions with Joel Willens about the possibilities.[39] The Court finds that as Bones was doing this, he was engaging in a pattern of conduct of making misrepresentations, and failing to disclose important facts, all with the intent of leading the Willenses to believe that an investment in or loan to SCSW was much less risky then it actually was. One form of such deceptive activity by Bones concerned the accounts payable that SCSW owed to its suppliers.

---

34. *See* Case No. 00–40486, Docket # 93 (order confirming plan), 61 (plan), and 132 (final decree).

35. Willens; PX–22.

36. PX–16, Promissory Note at p. 3.

37. *Id.* at unnumbered p. 6.

38. Bones.

39. Willens; Bones; *See, e.g.,* DX–S (Joel Willens's handwritten notes regarding his meeting with Bones on September 16, 1999).

SCSW was engaged primarily in manufacturing and selling steel racks to the automotive industry. As part of its business, SCSW had to purchase steel and other parts and supplies from a number of suppliers. As proven by the testimony of two SCSW employees, Theresa Camaj and Kathy Riker, during the Summer and Fall of 1999, Bones prevented many supplier invoices that SCSW received from being entered into the company's computerized accounts payable system. Bones did this by receiving all the company mail from the receptionist, and then not forwarding supplier invoices to SCSW staff to be processed and entered into the computerized accounting system. Rather, Bones put many unopened invoices away in a drawer or threw them out, and otherwise concealed them from SCSW staff. The result of this was that the number and amounts of SCSW's accounts payable during this period—the months leading up to the Willens's decision to lend money to SCSW—were substantially understated. This, in turn, obviously made SCSW's financial position appear better than it really was.

Ms. Camaj testified that beginning in March 1999, SCSW received phone calls from suppliers seeking payment on invoices, because payment had not been made on time. Ms. Camaj testified that this problem got "really bad" toward the end of Summer 1999 and in the Fall of 1999. Ms. Camaj worked on accounts payable. She estimated that 40% of the unpaid invoices SCSW owed were missing from the company's account payable system and reports as of November 19, 1999, when the Willenses made their $130,000 loan to SCSW. She testified that twice she found stacks of unopened supplier invoices in Bones's office when the trash was being emptied. And she testified that the accounts payable reports of the company were inaccurate at least as early as the end of the Summer of 1999, and that not all accounts payable were in the company's system until the end of 1999 or the beginning of 2000.[40]

Kathy Riker testified that she assisted Theresa Camaj in working on accounts payable, and that there was a problem with supplier invoices not being entered in the company's accounts payable system. The company would receive supplier statements listing unpaid invoices, for which some of the invoices were not in the accounts payable system. Ms. Riker and Ms. Camaj went into John Bones's office at one point in July or August 1999 and opened a drawer in his desk, and found a 3–4 inch stack of unopened invoices.[41]

At no time did John Bones ever disclose to Joel or Linda Willens that he had engaged in this form of deceptive conduct, or that the accounts payable records of SCSW were understated.

2. **Jones Bones's representations to Joel and Linda Willens that SCSW had an excellent relationship with General Motors, and failure to disclose that General Motors had placed SCSW on "red status" in July 1999 because of quality problems and late deliveries**

Before the Willenses made their first loan to SCSW in November 1999, John Bones represented to both Joel and Linda Willens that SCSW had an excellent relationship with General Motors.[42] These representations were false; they were belied by very serious quality and delivery problems that SCSW had with General Motors.

40. Testimony of Theresa Camaj.

41. Testimony of Kathy Riker.

42. Willens; Linda Willens

Effective July 30, 1999, General Motors placed SCSW on what it called "red status."[43] This status meant that General Motors would not give SCSW any new purchase orders. It did not, however, prevent SCSW from continuing to supply General Motors under purchase orders already in place.[44]

General Motors placed SCSW on red status because of quality problems and late deliveries. There were late shipments to General Motors because SCSW had trouble getting needed material to produce the steel racks that it made for General Motors. SCSW had trouble getting supply because it was late in paying its own suppliers.[45] According to Kathy Riker, SCSW was on "COD" status with quite a few of its suppliers because it hadn't paid their bills, and because of a lack of supplies, SCSW had been late with a lot of racks ordered by General Motors.[46] Quality improvement efforts were being made, but according to SCSW's Mark Levise, during October and November 1999 the quality problem was getting worse.[47]

John Bones never disclosed to Joel Willens or Linda Willens that General Motors had placed SCSW on red status, or anything about the implications of that status. Nor did any other employee of SCSW disclose these things to Mr. or Mrs. Willens.[48] In the Fall of 1999, while still considering whether to loan to SCSW, Joel Willens attended some of SCSW's regular weekly production meetings. John Bones testified that the General Motors red status and quality problems were always discussed at those meetings, but he could not recall or identify any particular meeting in which Joel Willens heard anything about the General Motors red status or what it meant.[49] (Nor could Bones identify or recall any document given to Joel Willens that would have revealed the General Motors red status.) And Kathy Riker, who attended the weekly production meetings at SCSW, testified that while Joel Willens may have attended a couple of those meetings, the General Motors red status was not necessarily discussed at them. The purpose of the meetings was to discuss the material available to produce the racks for General Motors, and quality was discussed in these meetings only if a particular problem came up with a rack or if engineering changes were made.[50] This tends to corroborate the testimony of Joel Willens, which the Court credits, that the General Motors red status was never mentioned in any production meeting that he attended.[51]

In a September 16, 1999 meeting to discuss the possibility of Willens investing in or lending to SCSW, Joel Willens asked John Bones to "tell me everything about the company." Bones said "OK."[52] But in that meeting, and later, Bones never told Willens about the company being on red status with its largest customer, General Motors. (Nor did Bones ever tell SCSW's secured lender, Cotpar, about General Mo-

---

43. PX–23 at Tab 26, unnumbered pp. 2, 12; see also Camaj; Bones.

44. Testimony of Mark Levise; Riker; Bones.

45. Camaj; Riker.

46. Riker.

47. Levise.

48. Willens.

49. Bones.

50. Riker.

51. Willens.

52. Willens. Moreover, Joel Willens took notes of the September 16, 1999 meeting, and they give no indication that John Bones said anything about General Motors placing the company on red status. DX–S.

tors placing the company on red status.)[53] The Court finds that this failure to disclose was part of a larger, deliberate effort by John Bones to conceal from Joel and Linda Willens the full extent of SCSW's financial and other problems.

In his testimony at trial, Bones testified that while Joel and Linda Willens were considering either investing in or loaning to SCSW, Bones gave Joel Willens 100% open access to SCSW employees for information. Bones testified, for example, that he instructed his employees to answer any questions that Joel Willens had, and that Willens came several times to the SCSW facility, both with and without Bones, in addition to attending a number of the weekly production meetings at the company.[54] But that testimony was contradicted by the testimony of Joel Willens and by former SCSW employees who testified at trial, and the Court finds John Bones's version on this point to be not credible.

The contrary testimony, which the Court credits, shows that Bones tried to strictly limit and control the information that Joel Willens received about SCSW. Joel Willens testified that in September or October 1999, Bones asked him not to talk to any of the SCSW employees about the company. Bones explained this request to Willens in two ways. First, Bones said that there were issues with the employees, that the employees thought that Bones was stealing money from the company to pay for work being done on his house. Second, Bones said that some people in the company were trying to force him out and take over, including Kathy Riker and her husband, Bob Riker.[55] Willens honored Bones's re-quest not to talk to the company employ-ees.[56] Willens denied that Bones ever told him that he could ask any questions of either Kathy Riker or Mark Levise, SCSW's in-house accountant. Bones did offer to allow Joel Willens to meet with Mark Martin, SCSW's outside accountant and Willens called Martin several times without success; Martin cancelled several appointments with Willens and never gave him any paperwork about SCSW.[57]

The former SCSW employees who testi-fied at trial on this subject were consistent with the testimony of Joel Willens, and contradicted the testimony of John Bones. Mark Levise, for example, testified that Bones gave him no instructions about com-municating with Joel Willens, other than asking Levise to take printed financial statements from the company's accounting software program to Joel Willens. This is in sharp contrast to what happened in July 1999, when Bones authorized Levise to meet with an earlier potential investor in SCSW, and discuss the company's books. (That potential investor chose not to in-vest.) Levise testified that he had made known to Bones that he would give an honest answer to any question he was asked.[58] Kathy Riker testified that while she had heard from others about Joel Wil-lens possibly investing in or loaning money to SCSW, John Bones never said anything to her about Mr. Willens, and never in-structed her to cooperate with Willens if he should ask her any questions.[59]

In his trial testimony, John Bones tried to downplay the adverse effect of General Motors placing SCSW on red status. He emphasized, for example, that even on red

---

53. Testimony of Dennis Brooks.

54. Bones.

55. Willens.

56. *Id.*

57. *Id.*

58. Levise.

59. Riker.

status the company could continue to supply racks to General Motors under existing purchase orders; that red status did not affect SCSW's ability to move forward on the new paint tool project (discussed in section III–E–6 below); and that SCSW had even obtained work on a new prototype exhaust tool and completed that work while on red status. But Bones also conceded that General Motors putting SCSW on red status was a "big strain" on the company, and that because of the red status, during the Fall of 1999, the company was running out of work, even as its accounts receivable from General Motors were increasing because of work the company was finishing.[60] There is no evidence that SCSW ever was able to leave red status before it went out of business, either before or after filing bankruptcy.

### 3. John Bones's alleged failure to disclose that on September 13, 1999, Cotpar declared SCSW in default on its loans

As noted in Section III–C above, SCSW's secured lender, Cotpar Trading, Ltd., declared SCSW in default on its loans in a letter dated September 13, 1999. Cotpar did not, however, accelerate the amount due on its loans at that time. Rather, the only adverse action taken in connection with the September· 13, 1999 notice of default was that SCSW was required to begin giving Cotpar daily borrowing certificates, and that SCSW was charged default-rate interest until the late payments were caught up.[61]

Plaintiffs did not meet their burden of proving, by a preponderance of the evidence, that John Bones failed to disclose

Cotpar's September 13, 1999 notice of default. Moreover, Joel Willens testified that before making the loans to SCSW, he had discussed with Bones their mutual view that SCSW was paying too much interest to Cotpar, including the 21% default interest rate when payments to Cotpar were late. For this reason, Willens thought that SCSW should have a new lender, to replace Cotpar.[62]

### 4. John Bones's alleged failure to disclose that he and SCSW's outside accountant had met with a bankruptcy attorney to discuss SCSW in October 1999

John Bones testified that he and Mark Martin, SCSW's outside accountant, met with a bankruptcy attorney regarding SCSW in October 1999. The evidence did not reveal anything further about what was discussed in that meeting. Given this, even assuming that Bones did not disclose this fact to Joel and Linda Willens before they lent money to SCSW, the Plaintiffs have not met their burden of proving, by a preponderance of the evidence, that nondisclosure of this fact was material.

### 5. John Bones's failure to disclose that he had been convicted in 1997 of embezzlement from an employee pension plan

When Joel and Linda Willens made their loans to SCSW, they did not know that on December 19, 1997, John Bones was convicted in United States District Court for the Eastern District of Michigan of embezzlement from an employee pension plan, in violation of 18 U.S.C. § 664.[63]

---

60. Bones.

61. PX–4; Brooks.

62. Willens.

63. PX–1; Bones; Willens.

Bones was sentenced to six months imprisonment, fined $5,000 and ordered to make restitution of $61,934.47 for his embezzlement.[64] As recommended by the federal court, Bones served his six month sentence in a community correction center, referred to by the parties at trial as a "half-way house," from February through August, 1998.[65] (While living in the half-way house, Bones was able to continue working.)

The conviction was based on Bones's embezzlement in April 1994 of $61,934.47 from the employee pension plan of Universal Steel, a company that Bones owned and controlled at the time.[66] In his trial testimony in this case, Bones claimed that all of the money he withdrew from the Universal Steel pension plan was invested into the business of Universal Steel, to help that company. But in fact at least $30,417 of the embezzled funds were spent on personal expenses of John Bones, including a large mortgage payment on his home and payment of a marina bill for his boat.[67]

Neither Joel Willens nor Linda Willens knew about Bones's conviction or criminal past when they loaned money to SCSW in November 1999 and January 2000. If they had known of it, they would not have made any loans to SCSW.[68] There is no evidence that either of them ever asked John Bones whether he had a criminal record, or anything about his background that would have included the criminal conviction. Nor did Bones volunteer any information to them about it, at least not until 2000 or 2001, long after the loans were made.

**6. Bones's conduct in causing SCSW to generate a false invoice to General Motors for $375,000, and causing that invoice to be entered into SCSW's accounts receivable records, followed by Bones's misrepresentations that this was a valid invoice**

On October 21, 1999, John Bones sent a one-page fax to Mark Levise at SCSW, instructing Levise to generate an invoice to General Motors in the amount of $375,000, and to date the invoice September 29, 1999.[69] The invoice was to be for so-called "hard" tooling for use in production of a disposable, plastic "paint tool," for three separate General Motors vehicle models, at $125,000 each. The "paint tool," in turn, was a small plastic device designed for use by General Motors at its Lake Orion, Michigan plant in painting trunk lids. The paint tool was to help hold the trunk lid in place while it was painted.[70]

For several months, John Bones had been working with personnel in the paint department at the General Motors Lake Orion plant to develop this plastic paint tool. The tool was designed to be an improvement over the metal-based paint tools widely in use. Bones claims to have invented the plastic paint tool, and he sought to develop it into a major program in which SCSW sold the plastic, disposable paint tool in large volumes to General Motors, eventually for all of its models and facilities. In June and July 1999, SCSW had arranged, through a subcontractor, to produce prototype tooling (sometimes referred to at trial as "soft" tooling because

64. PX–1 at pp. 2, 3; Bones.

65. PX–1 at p. 2; Bones.

66. PX–1; Bones.

67. PX–1 at p. 8; Bones.

68. Willens.

69. PX–6; Bones; Levise.

70. Bones.

it was made of aluminum, a softer and less durable metal than what the eventual "hard tooling" would be made of), and used that prototype soft tooling to produce a small quantity of prototype plastic paint tools. Specifically, in July 1999, SCSW sold to General Motors two aluminum prototype tools for making the plastic, disposable paint tool (also referred to as the "Disposable Plastic Deck Lid Tool").[71]

John Bones envisioned a large program with General Motors in which SCSW would hire another company owned by Bones, AIT Holdings, Inc. ("AIT"), to manufacture the plastic paint tool and sell it to SCSW, which would then package it and sell it to General Motors. Because this plastic paint tool was disposable, Bones envisioned a program of continuing purchase by General Motors of a large number of the plastic paint tools. As Bones envisioned it, SCSW would likely subcontract with one or more unrelated companies to manufacture the hard tooling, which SCSW would sell to General Motors, and AIT would use the hard tooling in manufacturing the disposable plastic paint tools. SCSW had a supplier relationship and a "vendor code" with General Motors, while AIT did not. But SCSW manufactured metal racks, and was not set up to manufacture plastic parts like the plastic paint tool. AIT, on the other hand, did manufacture plastic parts. As Bones envisioned this program, and explained it to Joel Willens, it would have at least a double benefit to SCSW in the future. First, SCSW would make large profits from continually selling large quantities of the disposable plastic paint tools to General Motors; and second, the economic benefit to AIT of the additional work in manufacturing the plastic paint tools for SCSW would better enable AIT to pay its roughly $540,000 debt to SCSW.[72]

When John Bones instructed SCSW's in-house accountant to prepare the $375,000 invoice to General Motors for hard tooling, Bones knew that General Motors had not issued any purchase order for any such tooling, nor had General Motors given SCSW any written or oral authorization or approval to proceed with production of hard tooling for the plastic paint tool program. Bones also knew that no such hard tooling had been produced. And while Bones instructed Levise to back-date the invoice to September 29, 1999, he also instructed him to place language on the invoice that would inform General Motors that it was not yet obligated to make any payment on the invoice. Bones instructed that the invoice should say "TERMS: NET 30 DAYS AFTER PPAP."[73] "PPAP" stands for "Production Part Approval Process." PPAP, as applied to production tooling, involves an extensive review and approval process that must be done before the "hard" or production tooling may used in manufacturing production parts.[74] Not only had the PPAP process not even begun with respect to hard tooling for the plastic paint tool project, but as noted above, General Motors had not even authorized or requested that SCSW make any hard tooling.

Thus, when Bones directed that SCSW generate the $375,000 invoice to General Motors on October 21, 1999, Bones knew that the invoice was not a legitimate invoice, in that General Motors was not obligated to pay SCSW anything for any hard tooling, nor was it clear that General Motors ever would owe SCSW anything for

---

71. *See* PX–3 at pp. 1, 4, 5.

72. Bones; Levise; Willens.

73. PX–6.

74. Riker.

any yet-to-be produced hard tooling. Rather, General Motors had not yet decided to go any further with the plastic paint tool program with SCSW. And in fact, General Motors never did so.[75]

When Bones directed that the $375,000 back-dated invoice to General Motors be generated by SCSW, he also knew that SCSW's accounting software would automatically include the $375,000 invoice in the list of accounts receivable owing to SCSW, and in any accounts receivable reports generated by that software.[76] And that is what happened—the invoice was generated and a corresponding account receivable of $375,000 appeared in SCSW's accounts receivable reports from that time on. Thus, for example, an SCSW "aged receivables" report printed on and as of October 28, 1999 listed an invoice to "GM Orion Assembly Center," invoice No. 052215, in the amount of $375,000, as being 0–30 days old.[77] This receivable remained in SCSW's accounts receivable reports until sometime in December 1999 or January 2000, when it was written off in contemplation of SCSW filing its Chapter 11 bankruptcy case.[78] It is unclear whether the $375,000 invoice was ever actually sent to General Motors. Bones testified that it was, but he could not produce a copy of it,[79] and it was not contained in a binder of documents produced by General Motors in response to Plaintiffs' subpoena in this case.[80] In any event, and as Bones knew, General Motors clearly never had any obli-

gation to pay the invoice, and it never did pay it.

When Mark Levise received the October 21, 1999 fax from John Bones, instructing him to generate the $375,000 General Motors invoice, Levise resisted vigorously. Levise knew that this was not a legitimate invoice and would not be a legitimate account receivable, and told Bones so. Levise was very concerned that if he generated the invoice as requested, a $375,000 receivable would show up in the SCSW accounting system, and would make the accounts receivable reports misleading. This led to a heated and loud argument between Bones and Levise at the SCSW offices. Among other things, Levise told Bones that the requested invoice was "bullshit."[81] This argument, which included yelling and vulgarity, was overheard by at least two employees of SCSW—Theresa Camaj and Kathy Riker.[82] Levise felt so strongly that he refused to generate the invoice himself, and advised Theresa Camaj that he would not do it if he were in her position, but that it was her decision.[83]

The paint tool project figured very prominently in the discussions between Joel Willens and John Bones leading up to the Willens's decision to lend money to SCSW in November 1999. Bones admitted that before the Willens loan, Bones had been telling the Willenses that the paint tool represented the future, because

---

**75.** Bones; Riker; Testimony of Josephine Lennier.

**76.** Bones.

**77.** PX–9 at p. 2.

**78.** *E.g.*, PX–14 p. 2 (November 12, 1999 aged receivables reports); Bones.

**79.** The invoice did actually exist at one time. Cotpar's Dennis Brooks testified that he reviewed a copy of it, sometime before Cotpar's second declaration of default against SCSW

on November 30, 1999. Brooks; *see generally* the discussion in Part III–C of this opinion.

**80.** Bones; PX–23 (General Motors documents).

**81.** Levise.

**82.** Camaj; Riker.

**83.** Levise.

of the commissions that it would generate for SCSW, and that the paint tool was a very important part of SCSW. Bones further admitted that he and Joel Willens were continuously talking about the paint tool.[84] Joel Willens testified that Bones told him that even though AIT would manufacture the disposable paint tool, SCSW would make most of the profit as the seller to General Motors.

Bones made a number of misrepresentations to Joel Willens about the status of the paint tool project before the first Willens loan was made to SCSW. Bones told Joel Willens that SCSW could repay the Willens loan, ultimately, through the large contract that Bones *had obtained* from General Motors for the paint tool. Bones told Willens that the paint tool project was beyond the prototype stage, that the paint tool was in production, and that General Motors was using it. Bones told Willens that General Motors was starting out with two or three car models, and that for these the paint tool was being produced and that General Motors was purchasing it.[85] All of these statements by Bones were false.

During the last week in October 1999, Bones had Mark Levise deliver SCSW financial reports to Joel Willens. Included was the SCSW aged receivables report as of October 28, 1999, which included in the 0–30 day category the $375,000 invoice to the General Motors Orion Assembly Center. Willens had previously received an SCSW aged receivables report dated September 21, 1999, and the $375,000 General Motors invoice was not on that report.[86] Willens noticed the new $375,000 receivable on the October 28, 1999 report, and talked to Bones about it. Bones never disclosed to Willens the true facts regarding the $375,000 invoice, which facts would have led Willens to conclude immediately that the invoice was not legitimate. Rather, Bones used the $375,000 receivable as a strong selling point to both Joel Willens and Linda Willens. For example, Bones pointed out to both Joel and Linda Willens, at a dinner in a Bloomington Hills restaurant in early November 1999, that this $375,000 receivable was much more than the Willenses would be lending to SCSW.[87]

When Joel Willens received the October 28, 1999 account receivable report from SCSW, showing the $375,000 receivable from General Motors, it was, as he testified, the proof that he was waiting for that the General Motors paint tool project was moving forward. Willens believed that the invoice was for work already completed. That, in turn, meant to him that the paint tool project was moving forward.

The Court finds that John Bones purposely caused a false invoice to be generated by SCSW with the intent of adding a new $375,000 receivable to SCSW's account receivable reports, in order to deceive Joel and Linda Willens into believing that General Motors was moving ahead with the paint tool project; that significant concrete movement forward had occurred (*e.g.*, SCSW had sold to General Motors hard tooling for the production of the plastic paint tool for three General Motors vehicle models,) that more was to come, and that General Motors already owed SCSW $375,000. The overall purpose of this was to help persuade the Willenses that lending money to SCSW was far safer than it really was. And Bones made all the other misrepresentations about the

---

84. Bones.

85. Willens.

86. Willens; PX–9; PX–10; PX–5.

87. Willens; testimony of Linda Willens.

paint tool project described above, with the same intent to deceive.

Bones testified at trial that he caused the $375,000 invoice to be generated, and then sent the invoice to General Motors, solely for the purpose of trying to prod General Motors forward—to try to move the project along. He further testified that even though he knew that generating such an invoice would automatically generate an account receivable in the SCSW account receivable reports, it never occurred to him that such receivable reports would be given to and mislead Joel and Linda Willens. And he denied making any intentional misrepresentations about the paint tool project to either Joel or Linda Willens.

The Court finds that John Bones's testimony on these subjects is not credible. It makes no sense for Bones to have thought that merely sending an *invoice* to General Motors would cause any material movement by General Motors on the paint tool project. If in fact Bones did send the invoice to General Motors, the invoice made clear on its face that there was no payment due, and General Motors obviously knew that SCSW had not produced any hard tooling. And if Bones wanted to prod General Motors forward by giving it a written *proposal* for hard tooling, he could have done this without generating an *invoice.*

John Bones did realize that generating a fake invoice to General Motors in such a large amount would be misleading to Joel and Linda Willens, absent some explanation. Mark Levise immediately and vigorously pointed out to Bones that such an invoice would make the company's account receivable reports misleading. And Bones's conduct on October 21, 1999, in causing SCSW to create this invoice, and the loud protest and argument that Bones promptly received from Mark Levise about the invoice, all came only a few days before Bones caused the misleading account receivable report to be sent to Joel Willens, in the last week of October 1999.

Not only is Bones's testimony on these issues not credible, but also Bones's testimony about the paint tool project in general, and much of his other testimony, is not credible. With respect to the paint tool project, and the *bona fides* of the $375,000 invoice, Bones testified inconsistently during the trial. And during trial he testified inconsistently with his previous deposition testimony on the subject. In his deposition before trial, and in the early part of the trial, Bones defended the legitimacy of the General Motors invoice, and testified that he had received an *oral* order from General Motors for the hard tooling. In testimony later in the trial, however, Bones finally admitted that he had no order or authorization from General Motors for the hard tooling, oral or written. On a more general note, the Court found the testimony of Mr. Bones at trial often to be unduly vague, ambiguous, and at times evasive. And Bones was effectively impeached at trial by the evidence of his 1997 federal felony conviction for embezzling roughly $62,000 from the Universal Steel Employee pension plan, discussed above.

**7. Bones's alleged misrepresentation in giving Joel Willens a false income statement for SCSW for the 10 months ending October 31, 1999**

Plaintiffs claim that John Bones caused Joel Willens to be given a false income statement for SCSW. Bones caused Joel Willens to be given, among other documents, an income statement for SCSW entitled "SCSW, INC. Income Statement For The Ten Months Ending October 31, 1999." This two page document was faxed

to Joel Willens on October 25, 1999.[88] Plaintiffs claim this income statement was false in several important ways, based upon the fact that much later, in June 2001, Willens received from SCSW's Kathy Riker an SCSW income statement for the same period (10 months ending October 31, 1999) with quite different numbers on it.[89] Plaintiffs claim that this second income statement presented the true numbers for SCSW while the first income statement that Joel Willens received on October 25, 1999 was false. Some of the numbers on the first statement are significantly better. That statement shows a year-to-date net income of $144,587.69 and a year-to-date profit of 2.53 percent. The second income statement, received by Willens well after the last loan to SCSW, shows net income for the same period of $54,325.79 and a profit of .92 percent.[90]

The Court finds that Plaintiffs failed to meet their burden of proving, by a preponderance of the evidence, that any of the numbers in the first income statement (PX–7) were false or incorrect at the time that statement was generated and given to Joel Willens on October 25, 1999. Mark Levise testified that the first statement (PX–7) must have been printed sometime during October 1999, but no later than October 25, 1999, since that is the date showing at the top of the document as the date when it was faxed to Joel Willens. Levise testified that the document would indicate in the title that it was "for the 10 months ending October 31, 1999" no matter when in October it was printed from the SCSW accounting software. The evidence further indicated that the numbers on the income statement, both the revenue and the cost/expense numbers, as well as the net income and profit amounts at the bottom of the statement, could change daily depending upon when during the month the statement is printed. Because this statement was printed no later than October 25, 1999, it could well have been quite different several days later at the end of October 1999. This is a plausible explanation for the fact that the numbers in the two income statements are different. The mere fact that the later statement (PX–8) is different than the earlier one (PX–7) does not mean that the earlier statement was inaccurate or false in any way when it was printed and given to Joel Willens on October 25, 1999. Plaintiffs bore the burden of proving that the first statement (PX–7) was false, and they failed to meet that burden.

## 8. Bones's representation in August or September 1999, that SCSW's cash flow problems were caused by a recent and sudden change in General Motors payment terms

Sometime in September 1999, John Bones told Joel Willens that General Motors had recently changed payment terms to SCSW, from 30 days to 60 days, and that this had really hurt SCSW's cash flow.[91] And Bones testified at trial that in September or October 1999, General Motors had changed its payment terms from "net 25th prox" to "second day of second month," effective in November 1999.[92] According to Bones, this change slowed the payment by General Motors of accounts receivable by 15–30 days or more at that time.

Bones's representation to Joel Willens was false, at least to the extent that it

88. PX–7; Levise; Willens.

89. PX–8; Willens.

90. *Compare* PX–7 at p. 2 with PX–8 at p. 2.

91. Willens.

92. Bones.

implied that the change in General Motors payment terms was a recent development as of September 1999. General Motors purchase orders admitted into evidence at trial show that General Motors made this change in their payment terms at least as early as November 3, 1998, to be effective at least as early as March 16, 1999.[93] Bones did not disclose this fact to Joel or Linda Willens.

### F. Reliance by Joel and Linda Willens on John Bones's misrepresentations

#### 1. Actual reliance

Joel Willens testified that he and Linda Willens relied upon the numerous misrepresentations by John Bones, described above. Specifically, Willens testified that the misrepresentations by Bones, especially those concerning the $375,000 account receivable from General Motors and the status of the paint tool project, strongly influenced his decision to lend money to SCSW, and that but for the misrepresentations, the Willenses would not have made any loan. The Court credits this testimony by Joel Willens, and finds that Joel and Linda Willens actually relied upon these misrepresentations in lending money to SCSW. This finding is further supported by the testimony of Linda Willens. She testified that she was very reluctant to make any loan to SCSW, but that she finally agreed to do so because her husband wanted to make the loan, and because of the misrepresentations that Bones made to her regarding the $375,000 receivable and the paint tool project. *See* section III–E–6 of this opinion. It is clear from the testimony of both Joel and Linda Willens that if Joel Willens had decided not to make the loan, Linda Willens would certainly have agreed with that decision, and no loan would have been made.

#### 2. Justifiable/reasonable reliance

A significant issue at trial was whether the actual reliance by Joel and Linda Willens was "justifiable" and "reasonable," with respect to misrepresentations covered by 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B), respectively.[94] The following facts are relevant to that issue.

Joel and Linda Willens are highly intelligent, well-educated professionals. Joel Willens has owned and operated a business for over 30 years but Linda Willens has no business background or business education.[95] Neither Joel nor Linda Willens had ever lent money to a business before they made their loans to SCSW, and they had no experience in manufacturing or in the automotive business.[96]

Before deciding to lend, and in making the loan, Joel Willens retained two professionals to represent and advise him about the proposed loan transaction—John Solomon, a certified public accountant and investment advisor, and Michael Beals, an attorney. Willens had been an accounting client of Solomon's since the early 1990's. Beals had not represented Willens previously, and in fact had acted as an attorney for *John Bones* since about 1996, on several earlier matters.[97]

---

93. PX–23, Table 12.

94. *See* the discussion of the elements under these Code sections in Section IV–A and IV–B of this opinion.

95. Linda Willens.

96. Willens, Linda Willens.

97. Willens; Solomon; Bones. Joel Willens testified that Bones and Willens each consented in writing to Beals's representation of Willens in this matter, and waived any potential conflict that Beals may have had.

In considering whether to make the loan, Joel Willens had John Solomon review SCSW financial statements. He did not ask Solomon to try to verify any of the information in the financial statements, and specifically, he did not ask Solomon to try to verify any of the accounts in SCSW's accounts receivable reports. Nor did Willens ask Solomon to meet with any SCSW employees. And Solomon did not talk to Mark Martin, SCSW's outside accountant.[98]

Before deciding to lend money to SCSW, before making the temporary $50,000 loan on November 11, 1999, and before closing on the $130,000 loan on November 18, 1999, Joel Willens learned the following facts:

1. During the 3–4 months of discussions between John Bones and Joel Willens preceding the November 1999 loan (August–November 1999,) Bones refused to allow Willens to talk to any SCSW employees about the company; Willens could speak only to Bones himself. Willens attended some of the SCSW weekly production meetings, as noted above, but early on, Bones asked Willens not to discuss anything about the company with any SCSW employees. Willens accepted and honored that request. He never asked any of the employees anything about the company, while he and his wife were considering whether to lend up to $200,000 to the company.[99] In his trial testimony, John Bones testified that he never restricted Joel Willens's access to SCSW employees. Rather, Bones testified, he gave Willens full access to employees.[100] The Court finds this testimony by Bones not credible. It is contradicted by the testimony of Joel Willens, which the court credits, and it is undermined by the testimony of other SCSW employees. The other SCSW employees who testified and who were asked about this said that John Bones did not authorize them to speak to Joel Willens about the company, or request that they do so.[101] And Bones tried to conceal from his employees, to the extent he could, that Willens was thinking about investing in or loaning money to SCSW. With the possible exception of Mark Levise, Bones did not tell his employees this, and when Bones asked Willens not to talk to SCSW employees, he gave Willens a cover story: "you're my builder; you're here to talk to me about remodeling."[102]

2. Bones did offer to have Joel Willens meet with Mark Martin, SCSW's outside accountant. Willens called Martin three or four times to set up a meeting, but Martin canceled the appointments they made, and Willens never was able to meet with Martin before closing on the SCSW loan on November 19, 1999. Willens testified that he now believes that Martin was avoiding him. (Martin did not testify at trial.) Nor did Willens ever receive any financial statements or other documents from Martin.[103]

3. The explanations that Bones gave for denying Joel Willens access to SCSW employees were suspicious. As noted above, Bones explained this to Willens in two ways. First, Bones said that there were issues with the employees, that the employees thought that Bones was stealing money from the

98. Willens; Solomon.

99. Willens.

100. Bones.

101. Levise; Riker.

102. Riker; Willens.

103. Willens.

company to pay for work being done on his house. Second, Bones said that some people in the company were trying to force him out and take over, including Kathy Riker and her husband, Bob Riker.[104]

Neither of these explanations makes sense as a reason for Willens *not* to talk to SCSW employees. Rather, they present very strong reasons for Willens to *insist* on talking to the employees before lending money.

The first of these explanations by Bones raises questions about his honesty and credibility, among other things. Why exactly did the employees think Bones was stealing from the company? Was there any truth to their beliefs? And if there was, how could the Willenses believe anything Bones told them?

The second of these explanations does not make much sense when one remembers, as Willens knew at the time, that Bones owned 75% of the stock of SCSW. (Bob Riker, the Vice President of the company, owned only 10% of the stock, and Kathy Riker owned no stock.)[105] How could the employees take over the company when John Bones owned 75% of it? And, even if they could possibly do so, how would such turmoil in the company affect the riskiness of the contemplated loan from the would-be lenders, Joel and Linda Willens?

Willens acknowledged in his testimony that Bones's request that he not talk to any of the SCSW employees "should have raised a red flag" with him at the time, but apparently it did not.

4. John Solomon, Willens's accountant and investment advisor, raised serious concerns about SCSW. Solomon told Willens that Bones had paid too much for the company when he acquired it in January 1999, because of the assumption of debt, including trade debt, associated with the transaction.[106] He also told Willens that he did not like what he saw in the company's financial statements; that he thought the numbers did not look good. He told Willens that his biggest concern was the company's unpaid payroll taxes, and that the payment of those should be a number one priority.[107] And Willens knew, beginning at least as early as September 16, 1999, that SCSW owed approximately $300,000 in unpaid taxes.[108] Solomon also told Willens that he wanted more information about the company.[109]

5. Before the loan closed on November 19, 1999, Michael Beals, Willens's attorney, told Joel Willens he was not comfortable with closing, because Beals had not yet received the information he wanted about the status of SCSW's loans with Cotpar, the senior secured lender.[110] Despite this, the Willenses chose to go ahead with the loan closing. But because of Beals's concerns, Willens chose to lend only $130,000 of the $200,000 total loan contemplated. Willens testified that his attorney Beals "probably" advised him not to close the loan until he had the missing information on the Cotpar loans, but he is not sure.[111] The Court finds from this testimony, and from the fact that Willens did

104. Willens.

105. Bones.

106. Willens.

107. Solomon.

108. Willens; DX–S, p. 2 (Willens's notes of his September 16, 1999 meeting with Bones).

109. Willens.

110. Willens.

111. *Id.* Beals did not testify at trial.

not call Beals as a witness at trial to testify about this, that Beals in fact did what Willens testified Beals "probably" did: *i.e.,* Beals advised Joel Willens not to go forward with the November 19, 1999 loan closing, and not to close on the loan until Beals and Willens knew what the status of the Cotpar loans were. With respect to the Cotpar loans, Willens testified that he never contacted Dennis Brooks or anyone else at Cotpar to inquire about the status of the loans. Nor did anyone else acting for Willens contact Cotpar before the Willens loan was made. Cotpar knew nothing about the Willens's loan to SCSW until after the fact, sometime in December 1999.[112]

6. When Joel and Linda Willens made their loan to SCSW, Joel Willens was aware of clear signs that SCSW was suffering severe financial distress. In addition to the fact that SCSW reportedly owed some $300,000 in unpaid payroll taxes (discussed above,) on November 11, 1999, eight days before the November 19, 1999 closing on the $130,000 loan, Bones asked Willens to make a $50,000 advance on the contemplated loan. Bones made this request even though, according to Willens, the loan was not ready to close—the attorneys were still working on the transaction documents for the loan, and Willens was still waiting for Bones to provide some necessary documents. Bones told Willens that he urgently needed the $50,000 to cover SCSW expenses, to pay some urgent bills that had to be paid that day.[113] As described in Section III–B of this opinion, Willens made the loan advance as requested.

If Joel Willens had insisted on talking with SCSW employees before lending, contrary to John Bones's suspicious request that he not talk to the employees, Willens would have learned, from any number of SCSW employees, including Mark Levise, Kathy Riker, and Teresa Camaj, about most of John Bones's alleged misrepresentations, including the most serious ones. Willens would have learned:

1. About Bones's conduct in suppressing invoices received from SCSW suppliers, so that the SCSW accounts payable were understated in the SCSW financial statements.

2. That SCSW had been on "red status" with General Motors since July 30, 1999, and that this status meant no new orders or new programs with General Motors, which represented some 90% of SCSW's business.

3. That SCSW did ***not*** have an excellent relationship with General Motors. Rather, it had a very problematic relationship, due to SCSW's multiple failures to deliver product on time and multiple quality problems.

4. That Cotpar had declared SCSW in default on its loans on September 13, 1999. (Willens would have learned this from Mark Levise.)

5. That the $375,000 account receivable from General Motors was not legitimate, and why it was not legitimate, and how it came about. (Levise, Riker, and Camaj each knew about this, and each of them would have told Willens about it if Willens had been permitted to talk to them.)

6. That General Motors had ***not*** ordered hard tooling for the paint tool project; that no such hard tooling had been made or delivered to General Motors; and that General Motors had ***not*** decided to go forward with the all-important paint tool project.

112. Willens; Brooks.

113. Willens.

In addition, Willens might have learned of John Bones's embezzlement conviction. SCSW's Vice President, Bob Riker, certainly knew of that conviction. He and Bones met in the half-way house, where each was serving a criminal sentence.[114] And so Bob Riker's wife, Kathy Riker, obviously also knew of the conviction, and she might have told Willens of it, if Willens had been permitted to talk to her.

Joel Willens also would have learned of John Bones's conviction if he had asked his attorney, Michael Beals, for any non-privileged, important information about John Bones and his background. But Willens never asked.[115] Beals knew about Bones's conviction. And even though Bones had consulted Beals on a legal matter related to that conviction,[116] the basic facts of the conviction clearly were not privileged. This is because the conviction was and is a matter of public record, in the United States District Court in Detroit.[117]

In addition, if Willens had insisted on meeting with Mark Martin, SCSW's outside accountant, rather than letting Martin repeatedly and suspiciously avoid him, Willens probably would have learned that in October 1999 Bones and Martin had met with a bankruptcy attorney to discuss SCSW.

And finally, if Willens had followed his attorney Beals's advice, and refused to close the loan to SCSW until he got the needed information on the status of the Cotpar loans, or if Willens had talked to Cotpar's Dennis Brooks directly as he was free to do, Willens would have learned of Cotpar's September 13, 1999 declaration of default.

If Joel Willens had learned that John Bones had deceived him about *any* of the matters just described, the whole house of cards would have crumbled on John Bones, and Joel and Linda Willens never would have lent anything to SCSW.

## IV. Discussion

### A. The elements of Plaintiffs' non-dischargeability claims

 In this case, Plaintiffs allege that John Bones made numerous misrepresentations to them, in the form of both affirmative misrepresentations and a fraudulent failure to disclose important facts. A "failure to disclose can amount to misrepresentation. A condition to invocation of the doctrine, however, is that there be a duty to make disclosure." *Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr.E.D.Mich.2001). Plaintiffs claim that John Bones's debt to them on his personal guaranty on the SCSW loans is nondischargeable under both 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Section 523(a)(2)(A) applies to misrepresentations "other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). As to fraud based upon a statement "respecting the debtor's or an insider's financial condition," only § 523(a)(2)(B) applies, and any such statement must be in writing. 11 U.S.C. § 523(a)(2)(B); *see generally Prim Capital Corp. v. May (In re May)*, 368 B.R. 85 (6th Cir. BAP 2007)(unpublished).

 Exceptions to discharge, including the exceptions under § 523(a)(2), "are to be strictly construed against the creditor." *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998) (citing *Manufacturer's Hanover Trust v. Ward (In re Ward)*,

---

114. Bones.

115. Willens.

116. Bones.

117. *See* PX–1

857 F.2d 1082, 1083 (6th Cir.1988)). The creditor must prove each of the elements under § 523(a)(2)(A) or (B) by a preponderance of the evidence. *Id.* (citing *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

■ The Sixth Circuit has described the elements of nondischargeability under § 523(a)(2)(A) in this way:

In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Id.* at 280–81 (citation omitted). A debt is nondischargeable under § 523(a)(2)(B) to the extent it is obtained by:

use of a statement in writing—

 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;

 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit, reasonably relied; and

 (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).

■ In this case, SCSW was clearly an "insider" of the debtor John Bones, as the term "insider" is used in subsections (A) and (B) of § 523(a)(2). "Insider" includes, in the case of an individual debtor, a "corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31). As noted in section III–B of this opinion, at all relevant times John Bones owned 75% of the stock of SCSW,

was its President, and clearly was the person in control of SCSW. For these reasons, SCSW at all relevant times was an "insider" of the debtor John Bones.

■ There are two significant differences between the Plaintiffs' nondischargeability claims under subsections (A) and (B) of § 523(a)(2). First, any misrepresentation by John Bones "respecting [his or SCSW's] financial condition" must have been in writing, and can only be deemed nondischargeable under subsection (B), not subsection (A). Any other misrepresentations can create nondischargeability only under subsection (A), whether they were oral or written. Second, reliance by Plaintiffs in this case on any given misrepresentation by Bones must have been "reasonable" to the extent it is assessed under subsection (B). To the extent subsection (A) applies, however, a lesser reliance standard applies—Plaintiffs' reliance on the misrepresentation(s) merely needs to be "justifiable."

These distinctions turn upon how broadly the Court construes the statutory phrase "respecting the debtor's or an insider's financial condition." There is a split of authority among the federal circuits and lower courts on this, and the Sixth Circuit has not ruled on the issue. The Sixth Circuit Bankruptcy Appellate Panel has ruled on the issue, in the unpublished decision *Prim Capital Corp. v. May (In re May),* and described the split in the case law:

Few circuit courts have directly addressed this issue. Two views have emerged on the proper interpretation of the phrase "respecting the debtor's ... financial condition." The "broad interpretation" includes any communication that has a bearing on the debtor's financial position. In other words, any communication addressing the status of a

single asset or liability qualifies. *See Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 705 (10th Cir.2005), *cert. denied* 547 U.S. 1163, 126 S.Ct. 2321[, 164 L.Ed.2d 840] (2006). The strict interpretation, on the other hand, limits statements "respecting the debtor's ... financial condition" to communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities. *See id.* at 705.

The Fourth Circuit has adopted the broad interpretation. *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir.1984). Meanwhile, the Eighth Circuit provides support for the strict interpretation. *Rose v. Lauer (In re Lauer)*, 371 F.3d 406, 413–14 (8th Cir.2004). Likewise, the Tenth Circuit in a detailed opinion also has adopted the strict interpretation. *Joelson*, 427 F.3d at 705.

368 B.R. 85 (6th Cir. BAP 2007) (unpublished). The *May* Court chose to follow the "strict interpretation," holding that statements "respecting the debtor's financial condition" are only those "that actually claim to state the debtor's overall financial health, net worth or assets and liabilities." *Id.*

In this case, it is unnecessary for the Court to choose sides on the case law split on this issue. Nor is it necessary to sort out which of John Bones's misrepresentations had to be written to be actionable under § 523(a)(2), or to decide which of the misrepresentations must be evaluated under the less demanding "justifiable" reliance element under § 523(a)(2)(A), as opposed to the "reasonable" reliance element under § 523(a)(2)(B). This is because the Plaintiffs have failed to prove that their reliance on any of Bones's misrepresentations was either "justifiable" or "reasonable."

## B. The "justifiable" reliance and "reasonable" reliance elements

■ The Supreme Court's decision in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) discussed the difference between "reasonable" reliance and "justifiable" reliance. In that case, the Court held that nondischargeability under § 523(a)(2)(A) requires a showing of "justifiable" reliance, not the "reasonable" reliance that is expressly required under § 523(a)(2)(B). 516 U.S. at 74–75, 116 S.Ct. 437. The Supreme Court described the concept of "justifiable" reliance. Quoting with approval from several sections and comments in the Restatement (Second) of Torts (1976), the Supreme Court observed:

The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.*, § 540.... The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.*, 545A, Comment *b*. **Justifiability is not without some limits, however. As a comment to § 541 explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the**

falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." ...

"[I]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."

516 U.S. at 70–71, 116 S.Ct. 437 (citations omitted) (emphasis added). Then, the Supreme Court quoted with approval the following statements from Prosser's Law of Torts, regarding "justifiable reliance:"

Prosser ... [states] that "the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case."

*Id.* at 71–72, 116 S.Ct. 437.

■■■ A creditor's "reliance [is] 'reasonable' under § 523(a)(2)(B) only if a prudent person in the creditor's position would have relied on the misrepresentation." *FirstMerit Bank, N.A. v. Green (In re Green),* 240 B.R. 889, 893 (Bankr. N.D.Ohio 1999) (citing *Field v. Mans,* 516 U.S. 59, 77, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).

Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*BancBoston Mortgage Corp. v. Ledford (In re Ledford),* 970 F.2d 1556, 1560 (6th Cir.1992) (citations omitted).

## C. Plaintiffs' failure to prove either justifiable or reasonable reliance

■■■ Based on the facts described in Section III–F–2 of this opinion, the Court must conclude that Joel and Linda Willens have failed to meet their burden of proving, by a preponderance of the evidence, that they justifiably or reasonably relied on John Bones's misrepresentations. To the extent the less demanding "justifiable" reliance standard applies, the standard generally does not require the victim of a misrepresentation to make an investigation. But as the Supreme Court explained in *Field v. Mans,* quoted above,

a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

And,

where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, **or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.**

516 U.S. at 70–71, 116 S.Ct. 437 (emphasis added; citations omitted). In applying these principles to this case, the Court

must bear in mind that the Section 523(a)(2)(A) and (B) exceptions to discharge "are to be strictly construed against the creditor." *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998).

 The Court has found that John Bones intentionally deceived Joel and Linda Willens by making numerous misrepresentations. But the Court also finds that Joel Willens was aware of numerous facts that were "red flags" that should have "serv[ed] as a warning" that he was "being deceived" by Bones, and that required Willens to investigate further before lending any money to SCSW. *See* discussion in Part III–F–2. Among other things, the circumstances required that Joel Willens (1) insist on talking to key SCSW employees, including Mark Levise and Kathy Riker; and (2) insist on talking to Mark Martin, SCSW's outside accountant, and (3) insist on learning the status of the Cotpar loans, all before lending any money to SCSW. Had Joel Willens done these things, he would have learned of John Bones's deception and misrepresentations, and would have decided not to make any loan to SCSW. And if Joel Willens had decided against making any loan, Linda Willens certainly would have agreed with that decision.

To the extent the more demanding "reasonable" reliance standard applies in this case, it leads to the same result, for basically the same reasons. Considering the totality of the circumstances, including those described in Section III–F–2 of this opinion, and the five factors outlined in the *Ledford* case, quoted above, the Court concludes that the Willens's reliance on the misrepresentations of John Bones was not "reasonable." Rather, a prudent person in the Willens's position would have investigated further, in the ways described above, and by doing so would have learned the truth, or at least enough of the truth, and therefore would not have relied on John Bones's misrepresentations by making any loans to SCSW.[118]

## V. Conclusion

For the reasons stated in this opinion, the Court must enter judgment for the Defendant, John Bones, on the Plaintiffs' nondischargeability claims. The Court will enter a separate order.

---

118. Because the Court concludes that Plaintiffs have failed to prove a necessary element of their nondischargeability claims, it is not necessary to discuss or decide the merits of Defendant's various affirmative defenses.