In re James CONLEY, Betty H. Conley, Debtors.

Lowell Lawson, Plaintiff

v.

James Conley, Betty H. Conley, Defendants.

Bankruptcy No. 10–30450.
Adversary No. 10–3169.

United States Bankruptcy Court,
S.D. Ohio,
Western Division at Dayton.

Oct. 5, 2012.

John J. Scaccia, Jr., Springboro, OH, Krystle Marko, Utrecht & Young, LLC, Troy, OH, for Plaintiff.

Harold Jarnicki, Lebanon, OH, for Defendants.

**Decision Determining Debts and Finding Debts Nondischargeable**

GUY R. HUMPHREY, Bankruptcy Judge.

## I. Introduction

This proceeding is about a debtor who entered into an arrangement with a relative concerning the purchase and use of two commercial trucks, in combination with her debtor spouse who repaired trucks for the same relative in his own repair garage, and what happened when the business venture failed. The legal issues include whether the debtors' conduct in obtaining the titles to the two trucks through use of the Ohio unclaimed motor vehicle statute and the subsequent disposition of those vehicles gives rise to a nondischargeable debt. The plaintiff asserts that the conduct of the debtors constituted false misrepresentations or false pretenses which makes the asserted debt nondischargeable under 11 U.S.C. § 523(a)(2)(A);[1] and in the alternative, the embezzlement of the motor vehicles makes the debt nondischargeable under § 523(a)(4). The court finds that the debtors' conduct gives rise to nondischargeable debts under § 523(a)(4).

## II. Issues for Determination by the Court

The court must address the following issues: a) does this court have the authority subsequent to *Stern v. Marshall*[2] to determine Lawson's state law fraud and embezzlement claims which underlie his allegation that the Conleys owe him a non-dischargeable debt and, if so, can the court also liquidate such claims through finding damages and entering judgment?; b) if the court has the authority to determine Lawson's state law claims, did the Conleys engage in conduct giving rise to liability under state law and, if so, what damages were incurred by Lawson?; and c) if the Conleys engaged in conduct that under state law gives rise to a debt owed by the Conleys to Lawson, is that debt nondischargeable under § 523(a)(2) or (4)?

## III. Procedural Background, Evidence Presented at the Trial, and Findings of Fact

### A. *Procedural Background*

James Conley and Betty Conley ("Betty" and collectively the "Conleys") filed a joint Chapter 7 petition on January 28, 2010 and received a discharge on July 15, 2011.[3] However, Lowell Lawson ("Lawson") filed a complaint against the Conleys to determine the dischargeability of a disputed debt pursuant to § 523(a)(2) and (4) (doc. 1) and the Conleys answered (doc. 2). The court conducted a trial on July 22 and 29, 2011, the parties filed posttrial memoranda (docs. 84, 85 & 92), and the court took the matter under advisement. This decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

On March 24, 2012, prior to the court reaching its decision, Lawson filed a motion to re-open the trial to admit "newly discovered evidence" and also sought an

---

1. Unless otherwise noted, all statutory references are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. §§ 101–1532, cited hereinafter in this decision as "§ _____".

2. *Stern v. Marshall,* — U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

3. Although the Conleys are married and filed a joint bankruptcy petition, they have been living separate and apart for many years. At one point James Conley innocently denied that he was married to Betty. Tr. 191. However, despite their years of separation, they have been able to cooperate with one another on family and business matters.

order of contempt and sanctions against the Conleys (doc. 96). After briefing and a hearing, the court denied the motion (docs. 110 and 111).[4]

### B. Evidence Presented at the Trial

### 1. Lawson's Purchase of Volvo Tractors from Clear Choice and the Formation of the Agreement between Lawson and Betty Conley

Lawson ran a small trucking company which did business as "Lawson Trucking," through which he hauled freight for brokers for a fee. Lawson testified that his company would typically haul 10–12 loads each week. Tr. 94. April Lawson, Lawson's wife, testified that as of January 2009 Lawson had two trucks, only one of which was operating. Tr. 177.

Betty and Lawson are relatives and have known each other for decades. In January 2009 Lawson told Betty that he needed money to pay for the insurance for his trucking operation or his insurance would be cancelled Tr. 382. In response, Betty gave him $1,000 to pay for the insurance, food and gasoline.

On April 8, 2009 Clear Choice Leasing, LLC ("Clear Choice") sold Lawson seven Volvo commercial truck tractors—six 1998 models and one 1993 model. Clear Choice provided seller financing for this sale through a $30,000 promissory note signed by Lawson payable to Clear Choice. The certificates of title were transferred to Lawson with a lien noted on each title in favor of Clear Choice, with the vehicle identification numbers ("VIN"). The vehicles were a 1998 Volvo VIN# 4VGWDAJH9WN748726 (the "8726 Tractor"); a 1998 Volvo # 4VGWDAJH5WN748805 (the "8805 Tractor"); a 1998 Volvo # 4VGWDAJH6WN748800 (the "8800 Tractor"); a 1998 Volvo # 4VGWDAJH0WN748811 (the "8811 Tractor") a 1998 Volvo # 4VGWDAJH8WN748815 (the "8815 Tractor"); a 1998 Volvo VIN# 4VG7DEJHXWN750349 and a 1993 Volvo VIN# 4VIWDBJF2PN659726.

The sole member of Clear Choice is Stephen M. Jordan. Jordan testified that two of the seven trucks were purchased later, in July 2009. In June 2009 Lawson executed an additional promissory note in the amount of $6,000 and Clear Choice took a lien on an additional tractor—another 1998 Volvo: VIN # 4VGWDAJh1wn748798. Although the modification of the original secured loan transaction was not entirely clear, Lawson held title to all the vehicles sold by Clear Choice. The purchase price for each tractor was $6,000. While some principal was paid over time, Lawson continued to owe Clear Choice most of the principal balance on the two promissory notes at the time of trial.

In April or May 2009 Betty, Lawson and Marcia Ledbetter, Lawson's office manager, met at Betty's residence to discuss Betty having her own truck terminal, using some of the trucks that Lawson had purchased from Clear Choice and Betty operating under Lawson Trucking's regulatory authority to haul loads. Tr. 92. On May 13, 2009 Betty gave Lawson $3,000 toward an ownership interest in Lawson Trucking, although the specifics of that interest were never defined by either party (Exh. C; Tr. 142, 175, 210–11, 264, 281, 389 & 446). The purpose of this investment was to form a joint venture with Lawson to permit Betty to use Lawson's licensing authority. Some of the $3,000 was used to pay insurance on the trucks.

---

**4.** *See Order Denying Plaintiff's Motion to Reopen Trial, Plaintiff's Motion to Find Defendants in Contempt, and All Requests for Sanctions (doc. 96)* (doc. 111).

Originally Lawson offered Betty five of the trucks acquired from Clear Choice on the condition that she made the loan payments owed to Clear Choice on those trucks. However, Lawson later decided that he wanted to keep three of those trucks, so they agreed that she would only purchase two trucks.

Ultimately Lawson and Betty agreed Betty would lease, with a purchase option, two of the 1998 Volvo tractors. The only document memorializing the agreement did not include any VIN numbers identifying which of the Volvo tractors Betty was acquiring. The lease payment by Betty on the two trucks was $1,100 each month [$550 per truck (Tr. 173–74) ], which would satisfy the obligation that Lawson had to Clear Choice on those tractors. In addition, she was responsible for all repairs and one-half of the insurance premiums on those two tractors. She was to pay Lawson $25 for each haul she received, but could otherwise keep any funds collected from any load hauled. The parties agreed to an "open door" policy, meaning that Betty was to allow Lawson (or one of his employees) to review all the paperwork for hauls. This policy enabled Lawson to comply with regulatory requirements and to have proper tax information. Under the parties' agreement, they would operate this business under the name "Lawson Trucking/All–In Transportation." Betty testified this name was chosen because she paid Lawson all the funds she had and was "all-in."

Lawson told Betty she could choose which of the Volvo tractors she would acquire. While she was not an expert on the

condition of trucks, her husband, James Conley, had years of experience as a mechanic who repaired commercial tractors. Based on his recommendations, Betty chose two trucks out of the five available. Tr. 386–87. However, as will be discussed, the testimony was inconsistent as to which two tractors were to be used and purchased by Betty.

While the arrangement between Betty and Lawson was reduced to writing, the parties disagreed over which writing was the correct recitation of the agreement and whether Betty Conley ever signed the typed agreement. *See* Exhs. 14, 409; [5] 15, 454–55; 17, 512–13; 23, 623–24; and Exh. C and Tr. 96–103;124–39;147–49; 273–91; 318–38; 350; 383; 389–95; 398; 401; 410; 411–12; 414; 415; 432; and 446–47. Regardless, the parties reached agreement over the terms previously noted and the disputes concerning which form of the agreement is the correct one and whether Betty actually signed one of them is not material to the court's determinations.[6] The material terms of the agreement were: 1) Betty was to purchase two Volvo tractors from Lawson by making the payments owed to Clear Choice on those trucks; 2) the purchase price and value of those two trucks was $6,000 each (Tr. 392); 3) Betty was authorized to use Lawson's regulatory authority under the name "All–In Transportation;" 4) Betty was to pay Lawson $25 for each load she hauled; and 5) Betty was responsible for all fuel, repairs and insurance.

#### 2. *Termination of the Agreement*

The venture between Betty and Lawson quickly began to veer off course. The

---

**5.** Some of the exhibits were voluminous and individual bates stamped numbers within certain exhibits were referred to throughout the trial.

**6.** Ledbetter testified that there were two signed copies of the agreement, but the Law-

son Trucking copy was inadvertently left behind by she and Lawson at Betty's residence after Betty signed it (Tr. 102). Betty testified she would not sign the contract because she would not be his employee or agent (Tr. 390).

parties began to argue about the amounts that Betty owed to Lawson and the amounts that Lawson owed to James Conley dba Port Diesel for repairs made to Lawson's trucks; Betty's desire to setoff amounts that Lawson owed to James Conley for truck repairs against amounts she owed to Lawson; Betty's involvement in trying to collect on behalf of James Conley dba Port Diesel and difficulties in communication of information concerning loads which Betty hauled using Lawson's regulatory authority.

A central source of conflict between the parties during the three months of this business relationship was access to records. Ledbetter, April Lawson and Lawson testified that access to appropriate documentation concerning the loads Betty hauled under Lawson's authority was essential to maintenance of the arrangement. This point was made clear to Betty at the outset of the negotiations, but communications with Betty proved difficult and the Lawson representatives struggled to obtain the records they needed.

Betty disputed that any communication problems were her fault. She testified that, after the first loads, Lawson insisted she come to his house to provide him with the paperwork. Betty testified that due to her asthma she could not breathe in Lawson's house because the Lawsons had 15 dogs. Tr. 395. The parties did, with some difficulty, communicate about many issues by phone and fax (Tr. 396), but Betty was not always open and forthcoming in her communication with Lawson.

The venture between Betty and Lawson began to unravel in late July 2009. On July 29th April Lawson sent a letter to Betty stating "Betty Conley All-in Transportation" owed "Lowell Trucking/All In Transportation" $2,920 which included the July and August truck payments, reim-

bursement for a certain load and other expenses (Exh. 17, 510).

The dispute reached an impasse on August 4, 2009. The evidence did not reveal the exact sequence of events that day, but reflects that the following transpired between Betty, Lawson and his employees:

a) Through three separate written notices dated June 4, 2009 but sent by Betty on August 4, 2009, Betty, on behalf of Port Diesel, demanded the following sums from Lawson for repairs asserted to have been made on Volvo tractors purchased by Lawson from Clear Choice and for additional storage charges: $4,775 for the 8800 Tractor; $3,670 for the 8815 Tractor; and $5,015 for the 8726 Tractor (Exh. 17, 527–29). April Lawson testified that Lawson probably would have received those demands on August 5th or 6th.

b) Also on August 4th, Ledbetter and Betty had a heated discussion. Ledbetter stated that Betty was discussing funds owed to her husband (dba Port Diesel) for repairs and Ledbetter told her those repairs were completely separate from the business arrangement between Lawson and Betty.

c) Ledbetter also sent a note to Betty on that day stating in part that communication needed to improve and "[w]e absolutely can not keep doing things the way its been going." (Exh. 17, 519).

d) Following the conversation between Betty and Ledbetter, and also on August 4, 2009, Betty faxed a letter to Lawson stating their contract was "void" due to a "breech [sic] of contract" by Lawson. Betty stated she was owed $10,210, which included $1,600 for insurance she paid, $3,000 paid "to buy half of authority. (com-

pany)" and $2,700 for loads that Betty Conley claims were cancelled due to Lawson "telling lies." (Exh. 15, 438). Betty also sent a hand-written note (Exh. 17, 520) listing her view of funds owed to her under the business arrangement.

e) In response to Betty's letter, April Lawson sent a letter to Betty which stated in part that "[James Conley] labor with Lowell has nothing to do with the business with you and him. Its ridiculous [sic] that it keeps getting brought up like that. [James Conley] will be paid all moneys owed when Lowell gets his truck. That is not a problem. Keep him out of this." (Exh. 17, 507).

Concluding this exchange of letters, notices, and conversations, on August 7, 2009 April Lawson faxed a letter to Betty telling her to "cease and desist" all operations and to return all the equipment (Exh. 17, 511). The letter stated Betty was in breach for failing to make certain payments, including for insurance and truck tags, and for failing to follow the "rules" of the parties' agreement.

### 3. Betty Conley's Collection Efforts Made on Behalf of Port Diesel

About the time that the business relationship between Betty and Lawson began its skid in late July or early August, Betty made a concerted effort to collect monies on behalf of her husband for repairs made to Volvo tractors which Lawson purchased from Clear Choice. James Conley repaired commercial trucks under the name "Port Diesel," "Port Diesel Service," and "Port Diesel Truck Service." [7] These efforts included telephone conversations between Betty and Lawson's employees and one conversation between Betty and Jordan, written demands sent to Lawson, and the successful transfer of vehicle titles to three tractors from Lawson to "Port Diesel."

The exact sequence of all these events is not clear, but it is clear that disputes arose

---

7. The Conleys testified that Port Diesel was a trade name or "dba" for four men who repaired vehicles out of the Conley garage located at the Conleys' Gallimore Road property—James Conley, Melvin Strickle, Clyde Slaven and Leonard Smith. Tr. 188,189–90, 193, 302, 403–04, 415–17. By contrast, the Lawsons testified that Port Diesel was "[James'] garage." Tr. 160, 256–58 & 302. When the application for a vendor's license was filed with the State of Ohio, the Conleys' daughter signed James Conley's name as "Owner" of Port Diesel. *See* Exh. 20, 559; Tr. 144–46 & 193–94. Betty testified that the reason that their daughter put James Conley as the owner of Port Diesel on the application was that "Lawson hired James to fix his trucks" and that had Lawson hired one of the other mechanics to repair his trucks, their daughter would have put that individual's name on the application. Tr. 422. However, there is a place on the Application for Vendor's License to Make Taxable Sales to describe the ownership structure of the entity applying for the vendor's license and the box "Sole owner" was checked, rather than partnership, associ-ation or any other form of ownership. Given the testimony of the Lawsons, the application for the Ohio vendor's license reflecting James Conley as the sole owner and containing his signature as the owner, Betty's pursuit of collections for Port Diesel, Betty's admission that Lawson hired James Conley to repair his trucks and the fact that the garage is located on Conleys' property, the court finds that Port Diesel was a trade name for James Conley. There was no evidence to the contrary except for the self-serving testimony of the Conleys, the veracity of which the court questions. Other mechanics used James Conley's garage facility to repair vehicles for consideration, but there was no evidence that Port Diesel was incorporated or formed as a legal entity or that it was a partnership with four partners. Rather, the credible evidence established that Port Diesel was a trade name under which James Conley operated and that Lawson hired James Conley to repair his trucks, not any of the other individuals who apparently repaired vehicles in James Conley's garage.

between Lawson and Betty relating to whether Betty owed Lawson money under their business arrangement; whether Lawson owed James Conley dba Port Diesel for repairs made to Lawson's trucks (*See, e.g.* Tr. 118–121,174, 370, 396, 398–99 & 460 and Exhs. 15 & 17); and the manner in which any sums asserted to be due to either party could be collected. Betty advised Lawson, through his employees, that James Conley would allow Betty to setoff amounts owed to him for his repairs made to Lawson's trucks against amounts she owed to Lawson. Conversely, Lawson directly and through Ledbetter, made it clear that he would not agree to a set-off of debts he owed to James Conley against amounts Betty owed to him (Tr. 106, 285; Exh. 17, 507). These disputes resulted in written demands and notices being exchanged asserting breaches and termination of the contract between Betty and Lawson.[8]

Having made no progress in collecting the sums that she felt were owed to her husband, Betty sent two written demands on his behalf dated September 30, 2009 addressed to "Lowell D. Lawson, Clear Choice leasing, DBA Lawson Trucking" and mailed to Clear Choice's business address. One letter attempted to collect $4,775 from Lawson or Clear Choice for repairs asserted to have been made by Port Diesel on the 8800 Tractor (Exh. 15, 442). The other letter sought to collect $3,670 for repairs which were asserted to have been made by Port Diesel to the 8815 Tractor (Exh. 15, 441). These writings stated that Lawson had authorized these repairs and that the bills needed to be paid within 14 days "to avoid further action."

Upon receiving the written demands from Betty, Jordan called Betty and advised her that a creditor with a lien on trucks as collateral is not the owner of the trucks and therefore is not responsible for repairs. Tr. 35–36. Referencing this comment, Betty stated that "he was talking language that's, I guess it's over my head." (Tr. 407). Jordan testified that Betty advised him during this phone conversation that she sent the letters so that he would "call Lowell and demand he pay her/Port Diesel" and if the invoices were not paid within 14 days; that "she was going to court and get a judgment on both Lowell and CCL—Clear Choice Leasing—... and force sale of these trucks...." Jordan responded "... that's okay since Clear Choice Leasing is first lien holder, I get paid off first and she gets the balance after Clear Choice Leasing pays off" and requested more detail and documentation on the repairs made, including receipts for parts purchased and installed on the trucks. Betty refused to provide him with any such documentation and she told him that "Possession is 90% of the law." Tr. 36–38; Exh. 14, 401–02. Jordan made contemporaneous notes of this conversa-

---

8. Betty's rendition of how the collection efforts on her part on behalf of James Conley dba Port Diesel transpired is as follows:

[W]hen I told [James Conley] that Lawson repo'd the trucks, he had two trucks sitting inside and he had one already road ready for Lawson and it was out the, outside the door. And he said, "Well, fax them something saying that they owe this money." Or, at first he said, "Don't worry about it, I'll take care of it." And so was, he said he was going to call Lawson would he deduct some of the repair bills for my payments.

So I don't know if he got around to calling or not, so I called April, Lawson's wife, and I said, "I think [James Conley] is going to let me deduct some of the labor that you guys owe for the payments." And then that's when they sent me letters saying that what Jim's got to do has got nothing to do with you and all of that stuff started happening. And so I just faxed them a letter and told them had breached the contract and I want my money back.

Tr. 401.

tion and Betty did not dispute his recollection. *See* Exh. 14, 401–02.

#### 4. *Transfer of Volvo Tractor Titles to Port Diesel and Lawson's Recovery of Tractors from the Conleys*

Having not received satisfaction from her written demands and telephone conversations with Lawson's representatives and Jordan, Betty set upon a course to obtain for James Conley dba Port Diesel titles to three of the Volvo tractors that Lawson purchased from Clear Choice and which were in the possession of the Conleys—the 8726 Tractor driven by Richard Weber, the 8800 Tractor and the 8815 Tractor.

The first step taken to obtain title to those tractors was to secure an Ohio vendor's license in the name of Port Diesel because the state would not allow transfer of the titles into the name of Port Diesel without a vendor's license. Tr. 201, 406 & 451. In a document dated August 26, 2009, James Conley, through the trade name "Port Diesel Truck Service" applied for a vendor's license for work beginning on May 1, 2009. The document was signed by the Conleys' daughter for James Conley (as the sole owner of Port Diesel) using James Conley's social security number (Tr. 144–46 & 193–94; Exh. 20, 559; Exh. 24, 643).

The Conleys pursued the transfer of the titles to the 8800 Tractor, the 8815 Tractor and the 8726 Tractor from Lawson to Port Diesel. On October 16, 2009 Betty completed and filed with the Greene County, Ohio Common Pleas Court unclaimed motor vehicle affidavits on behalf of James Conley (dba Port Diesel) for those three tractors. She also signed and submitted applications for certificates of title trans-

ferring the titles for those three tractors from Lawson to Port Diesel. *See* Exhs. 25B, C and D.[9] As a result, titles for those tractors were transferred from Lawson to Port Diesel.

However, Lawson recovered the 8726 Tractor from Richard Weber, one of Betty Conley's drivers, at a truck stop prior to the Conleys being able to dispose of it. Tr. 160. Subsequently, Lawson obtained the title to that tractor from Robert Young, who had received it from Betty Conley as payment of monies he was due. Tr. 160 & 217.

Leonard Smith, one of the mechanics who also repaired trucks at James Conley's Port Diesel garage, purchased the 8800 Tractor and 8815 Tractor, with the proceeds being split between the mechanics that performed the repairs on Lawson's tractors. Tr. 457–58. *See also* Tr. 190–91 (indicating tractors were sold for parts).

#### 5. *Significance of the Dispute of Which Tractors Betty Was Acquiring and Which Tractors Were Recovered by Lawson*

It was Betty's responsibility to repair and maintain the trucks which she was acquiring from Lawson. If the 8800, 8815 or 8726 Tractor was a tractor which Betty was acquiring from Lawson, the repairs and maintenance to that truck were her responsibility, not Lawson's. *See* Tr. 297, 376, 398; Exhs. 14, 409; 15, 454–55; 17, 512–13; 23, 623–24; and Exh. C. Under those circumstances, the cost of those repairs or maintenance could not be set off against amounts that Betty owed to Lawson (assuming that such a setoff would otherwise be appropriate) and no arguable basis would exist for the Conleys' self-help in the form of the transfer of title to those

---

**9.** The actual Affidavit for the 8726 Tractor is not included in Exhibit 25C, but those documents reflect that the title to that tractor was transferred from Lawson to Port Diesel through an unclaimed vehicle affidavit.

tractors and subsequent sale to Leonard Smith.

The two tractors which Betty chose to acquire from Lawson's small fleet of tractors were never identified in writing by VIN number (or in any other manner) and the parties' testimony conflicted over which tractors she was acquiring. Richard Weber testified that the tractor he drove was the 8726 Tractor. Robert Young also confirmed that the 8726 Tractor was the tractor which Weber drove for Betty and the logs maintained by Weber for regulatory purposes identified that tractor as the 8726 Tractor. *See* Tr. 215–217 & 222 and Exh. 19. April Lawson, Lawson and Ledbetter testified that this tractor was one of the two tractors that Betty was acquiring (Tr. 112, 161, 261, & 283–284). However, in his affidavit, Lawson stated that the 8800 Tractor and the 8815 Tractor were the tractors that Betty Conley was acquiring. Exh. 15, ¶¶ 4, 6, 7 & 8. Lawson and April Lawson both testified that the 8800 Tractor was one of the tractors being acquired by Betty. Tr. 157,164, 283–284. The Lawsons both testified that the 8815 Tractor was the tractor which was to remain a Lawson tractor, but which the Conleys permitted to be parked at the Conleys' Gallimore Road property because zoning laws and local ordinances prevented the Lawsons from parking it at their property. Tr. 159,167, & 299.

Betty testified unconvincingly that the 8805 Tractor and the 8811 Tractor were the tractors which she was acquiring:

Q. Mrs. Conley, what were the two tractors that you were purchasing from Mr. Lawson?

\* \* \* \*

A. Okay, some of them, Mr. Jordan's VIN's here out of the county, my eyes are bad. But, okay, the truck 815, that would be Lawson's and the 800 would be Lawson's and the 726. So mine would be the last three VIN's, 811 and 805.

Q. 811 and 805?

A. Yeah, them would have been my VIN's, probably . . . .

Tr. 443–44.[10] Betty also testified that both of her trucks were "repossessed" by Lawson and that neither of the two trucks she was acquiring from Lawson constituted any of the trucks for which she prepared and filed unclaimed motor vehicle affidavits on behalf of James Conley dba Port Diesel and for which she transferred titles to Port Diesel (Tr. 399–400). She stated that when her trucks were repossessed by Lawson, James Conley had two trucks inside at Port Diesel and one truck already repaired and parked outside the garage, all of which were Lawson's tractors that he drove or had towed to James's garage for repairs. Tr. 401, 445. It was Betty's testimony that the 8726 Tractor was the tractor that had already been repaired for Lawson and left outside the garage and "the next day it was gone." *See* Tr. 445. She further denied that she attempted to collect funds on behalf of Port Diesel for the tractors for which she was responsible, stating that: "I didn't even show Lowell Lawson anything that I owed on my two trucks because I owed it to [James Conley]." Tr., p. 402. James Conley testified similarly. Tr. 453.

Also clouding the issue of whether the tractors transferred by the Conleys into Port Diesel's name were the tractors

---

10. When the court asked Betty what the VIN numbers were for the tractors which she was to acquire from Lawson, the court finds that she answered by eliminating the VIN numbers pertaining to the tractors which the Conleys transferred into Port Diesel's name and then equivocally suggested VIN numbers of tractors which the Conleys did not transfer to Port Diesel.

which Betty was acquiring or were other tractors acquired by Lawson from Clear Choice was evidence reflecting that James Conley did repair work on one or more of the other tractors which Lawson acquired from Clear Choice. James Conley testified that all of the tractors which Lawson acquired from Clear Choice made it to his repair garage at one time or another. Tr. 450–454. Betty testified that James Conley worked on Lawson's tractors. Tr. 392–93. Ledbetter testified that James Conley did work on at least one other tractor that Betty was not acquiring. Tr. 130–31. Lawson testified that James Conley did work on his trucks, including those that he purchased from Clear Choice. Tr. 299–300; 356–57 ("When I, when we first started I had him work on them several times and I paid him.").

Perhaps the only consistent testimony as to the repair of the Lawson tractors was that prior to the disputes that arose relating to the business arrangement between Betty Conley and Lawson, Lawson took trucks to James Conley to be repaired on a number of occasions and never encountered a bump in the relationship. Tr. 299–303 (Lowell Lawson testimony concerning the history of his truck repair payments and financial arrangements with James Conley); Tr. 408–09 (Betty Conley testimony concerning the history of repair work performed by James Conley for Lawson); and Tr. 456–57 (James Conley: "Yeah, pretty much he always paid me up but it just seemed we got into this deal and it just stopped. . . .").

#### C. *Findings of Fact*

Based upon the evidence presented and the court's observation of the witnesses, the court makes the following findings:

1. Ledbetter's and April Lawson's testimony was wholly credible. While Lawson became emotional and agitated at times, impairing the effectiveness of his testimony during those times, the court nevertheless finds that his testimony was credible. The court finds that Jordan's testimony was wholly credible.

2. Weber's and Young's testimony that Weber drove the 8726 Tractor for Betty was credible. The regulatory logs (Exh. 19) support that testimony and Weber did not have any reason to have falsified those logs. Accordingly, the court finds that the 8726 Tractor was driven by Weber for Betty and was one of the tractors which Betty was acquiring from Lawson.

3. Despite Betty being contractually responsible for the repairs on the 8726 Tractor, Betty submitted an invoice to Lawson and Clear Choice asserting that they owed Port Diesel for repairs to that tractor and then transferred the title to that tractor into Port Diesel's name. The Conleys gave the title to that tractor to Young.

4. Other than the self-serving testimony of Betty, there was no evidence that both of her trucks were repossessed or recovered by Lawson, including when and how any other tractor which Betty was acquiring from Lawson was recovered by him. The testimony of Ledbetter that only one such tractor was recovered by Lawson was consistent with the testimony of the Lawsons. The only truck that Betty was acquiring from Lawson that was recovered by Lawson was the 8726 Tractor.

5. One of the other tractors that the Conleys obtained title to through the unclaimed vehicle affidavits was a tractor which Betty was acquiring from Lawson, for which she was responsible for the repairs and maintenance, and for which the Conleys

wrongfully invoiced Lawson. All the credible evidence established that Lawson recovered only one of the two trucks which Betty was acquiring from Lawson and for which she was responsible for the repairs. No credible evidence was introduced that Lawson recovered both of the tractors which Betty was acquiring from him and credible evidence was provided that he only recovered one of the two tractors which she possessed under her agreement with Lawson. The court concludes that one of the two remaining tractors which the Conleys transferred to Port Diesel's name was a tractor which Betty was acquiring from Lawson and for which she was responsible for the repairs. Based upon the Lawsons' and Ledbetter's testimony, the court finds that was the 8800 Tractor.

6. The Lawsons credibly testified that they parked a third tractor at the Conleys' property due to zoning or other such issues at their property. The Conleys never refuted this testimony. The other vehicle transferred by the Conleys into Port Diesel's name was a tractor parked by Lawson at the Conleys' property with the Conleys' consent and was not driven or towed there for repairs. Based upon the Lawsons' and Ledbetter's testimony, the court finds that this was the 8815 Tractor.

7. The invoices prepared by Betty for James Conley dba Port Diesel are suspect for the following reasons:

a. There were no signed work orders from Lawson authorizing the work to be done on the specific tractors. The Conleys provided no supporting documents for the invoices, such as invoices for parts purchased.

b. The invoices which Betty prepared for James Conley dba Port Diesel for the 8800 Tractor (Exh. 25B) and for the 8815 Tractor (Exh. 25D) were prepared on August 5, 2009, after Lawson (through April Lawson) sent a letter on July 29, 2009 itemizing amounts which Lawson sought from Betty based upon their business arrangement (Exh. 17, 510) and afterwards, on August 4, 2009 Betty sent a letter to Lawson stating that the "contract between Lawson trucking and All–In transportation (betty conley) is now void due to breech [sic] of contract by Lowell Lawson." Thus, the invoices were not prepared by James Conley contemporaneously with the alleged work being done. Rather, they were prepared by Betty after the business arrangement between Lawson and Betty ended and Lawson sought money from her under their business arrangement. The court finds that the invoices sent by Betty were an attempt to deflect her obligations to Lawson.

c. The invoices include storage charges from the time that the work was allegedly ordered (June 16, 2009 for the 8800 Tractor (Exh. 25B) and July 4, 2009 for the 8815 Tractor (Exh. 25D)) until the work was allegedly completed on August 5, 2009 on both tractors. The storage charges during the time that the Tractors were being repaired was unjustified.

d. While the invoice for the 8800 Tractor contains references to "3–Tires, Transmission Repair, Motor Repair, exhust [sic] replaced," the invoice for the 8815 has no itemization at all other than "owner wants truck tow to shop and do whatever repairs needed to have road ready!" *See* Exhs. 25B and 25D.

8. Consistent testimony established that, prior to the disputes at issue, Lawson always paid James Conley for repairs made to his trucks.

9. Lawson refused to allow Betty to set off the obligations that the Conleys asserted that Lawson owed to James Conley dba Port Diesel against the amounts owed by Betty Conley to Lawson.[11] The Conleys reacted by transferring titles to the 8800, 8815 and 8726 Tractors into Port Diesel's name. Betty never refuted that she told Jordan that "possession was 90% of the law" or that she told Lawson she would "own these trucks before it's over with." Tr. 286–87.

10. While most of the conduct involved in the transferring of the titles to the 8800, 8815 and 8726 Tractors, including preparing the Port Diesel invoices, collection notices and the unclaimed vehicle affidavits, was taken by Betty, the evidence establishes that James Conley suggested that course of action and consented to the taking of that action as the owner of Port Diesel. *See* Betty testimony at Tr. 401, referencing a statement made by James Conley: "Well, fax them something saying that they owe this money." In addition, the vendor's license and unclaimed motor vehicle affidavits were all completed on behalf of Port Diesel and James Conley has never disavowed those acts on behalf of Port Diesel, his trade name. The evidence established that James Conley ratified those acts.

## IV. Legal Conclusions

### A. *Jurisdiction*

This court has subject matter jurisdiction over this adversary proceeding pursu-

ant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. § 1409(a).

### B. *Burden of Proof*

■ The plaintiff must establish the elements of his nondischargeability claims by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Further, because exceptions to discharge are limits on a debtor's ability to obtain a "fresh start" in bankruptcy, they are to be narrowly construed. *Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 532–33 (Bankr.S.D.Ohio 2008), *citing Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998).

### C. *Constitutional Authority to Enter Judgment on Lawson's Underlying Claim*

■ In order for a creditor to establish that his debt owed by the debtor is nondischargeable under any § 523(a) exception to discharge, a debt must be owed by the debtor to the creditor. *Steed v. Shapiro (In re Shapiro)*, 180 B.R. 37, 38 (Bankr. E.D.N.Y.1995); *Spinnenweber v. Moran (In re Moran)*, 152 B.R. 493, 495 (Bankr. S.D.Ohio 1993). In many cases a debt owed by the debtor to a creditor will have been liquidated prior to the filing of the debtor's bankruptcy. In other cases the debtor does not dispute that a debt is owed, but rather only whether that debt meets one of the bases for nondischargeability. However, Lawson requests this court to do both: to enter a judgment in

---

**11.** Nor did the Conleys provide any legal authority that such a three party set-off under

these circumstances is lawful.

his favor on an unliquidated debt and also to determine that any such debt is nondischargeable.

Prior to the Supreme Court's recent decision in *Stern v. Marshall,* bankruptcy courts frequently adjudicated and entered judgment on an underlying debt in reaching a determination that a debt is nondischargeable. 131 S.Ct. 2594 (2011). The Sixth Circuit, prior to *Stern v. Marshall,* held that bankruptcy courts may liquidate and enter judgment on the debts in nondischargeability actions. *Longo v. McLaren (In re McLaren),* 3 F.3d 958, 965–66 (6th Cir.1993). *Stern* involved a state law counterclaim for tortious interference filed by a debtor against a creditor who filed a proof of claim for defamation. The court found such a claim was a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C). *Stern,* 131 S.Ct. at 2604. Nevertheless, *Stern* held that a bankruptcy court "lacked constitutional authority to enter final judgment upon a state law counterclaim that is not resolved in the process of ruling upon a creditor's proof of claim." *Stern,* 131 S.Ct. at 2620. The majority opinion of Chief Justice Roberts stated "[w]e do not think the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one." *Id.* Despite the self-described narrowness of the majority's holding, the analysis in the *Stern* decision has given rise to questions as to whether bankruptcy courts may constitutionally enter final judgments adjudicating a debt based upon state law. *See Yellow Sign, Inc. v. Freeway Foods, Inc. (In re Freeway Foods of Greensboro, Inc.),* 466 B.R. 750 (Bankr.M.D.N.C.2012) ("Since [Stern] many litigants and courts have struggled to understand [ ] *Stern's* reasoning and apply its holding.").

■ In light of the *Stern* decision, this court must assess whether it has the constitutional authority to enter a final judgment on Lawson's state law claims as part of determining the dischargeability of the debt. Reported decisions after *Stern* have found that bankruptcy courts have the constitutional authority to enter final judgment upon a debt based upon state law within a dischargeability adversary proceeding. *See Dragisic v. Boricich (In re Boricich),* 464 B.R. 335 (Bankr.N.D.Ill. 2011) ("[T]his action contrasts with *Stern* in being an action directly under and defined by the Bankruptcy Code to determine nondischargeability rather than being independent of bankruptcy law."); *Deitz v. Ford (In re Deitz),* 469 B.R. 11, 20–24 (9th Cir. BAP 2012) (bankruptcy courts have the constitutional authority to enter final judgment within a dischargeability proceeding). The court is not aware of any post-*Stern* decision determining bankruptcy courts may not enter final judgment upon a state law cause of action within a dischargeability adversary proceeding.

■ This court is also mindful that binding circuit precedent, such as *McClaren,* cannot be lightly determined to be overturned based upon a broad interpretation of a Supreme Court decision. *See Farooqi v. Carroll (In re Carroll),* 464 B.R. 293, 313 (Bankr.N.D.Tex.2011) (decision followed Fifth Circuit precedent, *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison),* 555 F.3d 473, 478–80 (5th Cir.2009), and concluding bankruptcy courts have the constitutional authority to liquidate state law claims within a dischargeability adversary proceeding); *Deitz,* 469 B.R. at 23 (noting that "overturning a long-standing [circuit] precedent is never to be done lightly."). *See also Cooper v. MRM Inv. Co.,* 367 F.3d 493, 507 (6th Cir.2004) ("Under the law-of-the-circuit doctrine, only the Court sitting *en*

*banc* may overrule published circuit precedent, absent an intervening Supreme Court decision or a change in applicable law."). Particularly in light of the majority's admonition in *Stern* that the decision be interpreted narrowly and the *McClaren* precedent directly addressing this specific question, the court finds it has the constitutional authority to enter a final judgment liquidating this debt under Ohio law.

## D. *Analysis of Lawson's State Law Claim to Establish a Debt Based upon Conversion*

 In order to establish the nondischargeability of a debt, the creditor must first show the existence of a debt under state law. *Steed v. Shapiro (In re Shapiro)*, 180 B.R. 37, 38 (Bankr.E.D.N.Y.1995); *Spinnenweber v. Moran (In re Moran)*, 152 B.R. 493, 495 (Bankr.S.D.Ohio 1993). Since Lawson's claims are unliquidated, the court will liquidate any such debt and determine the dischargeability of the debt. While the existence of the debt is determined through the application of state law, determination of the dischargeability of any such debt must be determined under the nondischargeability provisions of § 523(a). *Garner*, 498 U.S. at 284, 111 S.Ct. 654; *First American Title Ins. Co. v. Pazdzierz (In re Pazdzierz)*, 459 B.R. 254, 259 (E.D.Mich.2011).

 Ohio recognizes a civil cause of action for conversion. *See* Complaint (doc. 1, ¶ 17) (alleging the Conleys "converted . . . property for their own use"). Conversion under Ohio law is the "wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Fenix Enterprises, Inc. v. M & M Mortgage Corp.*, 624 F.Supp.2d 834, 843 (S.D.Ohio 2009). *See*

*also Landskroner v. Landskroner*, 154 Ohio App.3d 471, 797 N.E.2d 1002, 1012 (2003) (conversion can only be of identifiable, tangible personal property). The elements of conversion are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Fenix*, 624 F.Supp.2d at 843. If the defendant originally acquired possession of the property lawfully, but retains that property in contravention to the plaintiff's rights in that property, then ordinarily a demand and refusal are required to prove conversion. *Id.*

 The Conleys disregarded Lawson's ownership interest in the 8800 Tractor and the 8815 Tractor, and, as more fully described in the dischargeability section, converted those tractors by deliberately misusing Ohio law and damaged Lawson by depriving him of two tractors. Although these trucks were originally held by the Conleys lawfully, the retention of them became unlawful when the business venture ended and the Conleys had an obligation to return the vehicles.

Having found that Lawson established a debt for conversion, the court must determine the amount of the debt. The undisputed evidence established that the value of each of the tractors converted was $6,000. Accordingly, the court finds the damages in favor of Lawson are $6,000 against Betty relating to her conversion of the 8800 Tractor and $6,000 against James Conley relating to his conversion of the 8815 Tractor.[12]

## E. *Lawson's Request for Attorney Fees and Punitive Damages*

 Lawson also perfunctorily requested attorney fees through the prayer

---

12. The explanation as to how the court arrived at $6,000 for one tractor converted by Betty and $6,000 for another tractor convert-

ed by James Conley is in the subsection addressing the nondischargeability of the debt.

of his complaint and punitive damages through his post-trial brief. The court is denying all such relief. First, he has not advised under what circumstances this court may award punitive damages, attorney fees or any other special or extraordinary relief and how this case qualifies. The court is not obligated to research and construct the legal arguments open to parties particularly when they are represented by legal counsel. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir.2003). Because Lawson's request is undeveloped without supporting legal citations or evidence, it is waived and the court declines to address it. *See Allen v. Astrue*, 2011 WL 3325841, at *11 (N.D.Ill. Aug. 1, 2011). Further, Bankruptcy Rule 7008(b) requires that attorney fees be pled as a separate count, which Lawson did not do. Finally, no evidence was presented concerning Lawson's attorney fees or an appropriate amount for punitive damages. Finally, even if Lawson would otherwise qualify for the award of punitive damages, the court finds that the award of $6,000 each in compensatory damages against the Conleys is sufficient to deter them from future conduct.

In the next sections, the court will address Lawson's theories of dischargeability as pleaded in his complaint.

### F. *Count Three—False Misrepresentation Under 11 U.S.C. § 523(a)(2)(A)* [13]

 Count Three of Lawson's complaint alleges that the Conleys made false representations, which coupled with Lawson's detrimental reliance, constituted a fraudulent misrepresentation. Section 523(a)(2)(A) provides, in relevant part, that: "(a) a discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... a false representation...." 11 U.S.C. § 523(a)(2)(A). To establish the nondischargeability of a claim for fraudulent misrepresentation under § 523(a)(2)(A), the following elements must be established: "1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor relied on the false misrepresentation; and (4) its reliance was the proximate cause of loss." *Rembert*, 141 F.3d at 280–81. The reliance necessary to establish nondischargeability for a fraudulent misrepresentation is "justifiable reliance." *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

 Under the justifiable reliance standard, a party is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71, 116 S.Ct. 437. However, a party generally is under no duty to do an investigation for

---

**13.** Lawson pleaded § 523(a)(4) in Count 3, but the reference to § 523(a)(4) is an obvious scrivener error because the elements cited in the allegations are those of a false representation count under § 523(a)(2)(A). The Conleys concede this point in their post-trial brief (doc. 92, p. 15). To the extent Lawson is raising fraud in a fiduciary capacity under § 523(a)(4), such a theory is fatally flawed because the Conleys were not fiduciaries with respect to Lawson and there was no express trust which pre-existed the dispute between the parties. *See Commonwealth Land Title Co. v. Blaszak*, 397 F.3d 386, 391–92 (6th Cir.2005).

justifiable reliance to be found even if such an investigation might have revealed the fraud. *Willens v. Bones (In re Bones),* 395 B.R. 407, 432 (Bankr.E.D.Mich.2008); *Haney v. Copeland (In re Copeland),* 291 B.R. 740, 767 (Bankr.E.D.Tenn.2003). In considering justifiable reliance, the court may consider the sophistication of the creditor and the parties' past relationship. *Liberty Savings Bank, FSB v. McClintic (In re McClintic),* 383 B.R. 689, 694 (Bankr.S.D.Ohio 2008); *Wilhelm v. Finnegan (In re Finnegan),* 428 B.R. 449, 456 (Bankr.N.D.Ohio 2010), *citing Eugene Parks Law Corp. Defined Benefit Plan v. Kirsh (In re Kirsh),* 973 F.2d 1454, 1459 (9th Cir.1992).

▆▆▆▆▆ Lawson specifically alleges the following as the misrepresentations:

> Betty Conley ... entered into a business arrangement with Lowell Lawson by misrepresenting a desire for a partnership. Betty Conley explained that if Lowell Lawson would share his trucks and the information to run a trucking operation under his authority she would make payments on the trucks, share profits, records and make repairs. These terms were material and of the essence of any agreement serving as the basis of the business relationship between the Debtors and the Lawson Trucking. Without the misrepresentation Mr. Lawson would not have entertained the Conley's business proposition or committed his trucks and personal business information.

Lawson post-trial brief, p. 15 (doc. 84). These asserted fraudulent misrepresentations concern future conduct, intention or expectation that Betty would make payments and perform under the agreement in the future. To warrant a finding of nondischargeability, a representation must be one of existing fact and not merely an expression of opinion, expectation, or declaration of intention. *Smith v. Meyers (In re Schwartz & Meyers),* 130 B.R. 416, 423 (Bankr.S.D.N.Y.1991); *Bucl v. Hampton (In re Hampton),* 2008 Bankr.LEXIS 1943, at *21–22 (Bankr.D. Kan. June 27, 2008), *aff'd* 2009 WL 612491, 2009 Bankr.Lexis 3327, 407 B.R. 443 (10th Cir. BAP March 11, 2009) (table decision).

The court finds that Betty entered into the business arrangement with Lawson and obtained the two tractors from Lawson with the intention of running a trucking operation for the parties' mutual benefit and that James Conley's initial involvement was only to assist Betty in selecting which tractors she would acquire from Lawson. Any wrongful conduct of the Conleys did not occur at the outset of the business arrangement. Lawson did not establish that the Conleys made any representation at the outset of the business arrangement with an intention to not perform and the court finds based upon the evidence that Betty entered into the arrangement intending to perform her end of the bargain.

Lawson's allegations regarding his § 523(a)(2)(A) fraudulent misrepresentation claim appear to be largely premised upon asserted misrepresentations made by the Conleys at the time of or prior to the time that Betty and Lawson reached agreement as to their venture. *See Proposed Findings of Facts & Conclusions of Law,* ¶¶ 5, 15 & 22. However, to the extent that Lawson has asserted that the Conleys made representations or otherwise took actions after he and Betty began performing under their business arrangement, including representations or other asserted fraudulent conduct relating to the conversion of the tractors, Lawson failed to prove the reliance necessary to prove that such conduct was a fraudulent misrepresentation under § 523(a)(2)(A).

### G. Count Two—False Pretenses Under 11 U.S.C. § 523(a)(2)(A)

 Lawson's complaint also alleges that the Conleys "entered into the business agreement with the intent to deceive [Lawson] and retain possession of [Lawson's] property" and that "[s]uch conduct constitutes false pretenses." doc. 1, ¶ 20. Accordingly, an analysis of whether the Conleys engaged in a fraudulent scheme involving false pretenses is required. For dischargeability purposes, false pretenses is differentiated from false misrepresentation only in that it is not expressed, but implied based on conduct designed to give a false impression. *James v. McCoy (In re McCoy)*, 114 B.R. 489, 498 (Bankr. S.D.Ohio 1990).

As explained, material misrepresentations of the Conleys concerned conduct subsequent to the parties entering the business arrangement. Lawson did not specifically rely on these misrepresentations later to take any specific action. The cause of action for false pretenses under § 523(a)(2)(A) was not proven.

### H. Count One—Dischargeability for Embezzlement Under § 523(a)(4)

The first count of the Complaint alleges that "[a]fter acquiring [Lawson's] tractors and other assets, [the Conleys] converted such property for their own use with the intent to embezzle from [Lawson]" and "[t]he embezzlement engaged in by [the Conleys] creates an exception to discharge pursuant to § 523(a)(4)." Complaint (doc. 1, ¶¶ 17 & 18). Accordingly, the court must determine if Lawson established that the Conleys embezzled his tractors within the meaning of § 523(a)(4), resulting in a nondischargeable debt.

 For dischargeability purposes under § 523(a)(4), embezzlement is defined by federal common law as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir.1996). "Embezzlement differs from larceny in that the debtor's original acquisition of possession of the property was lawful." *Chapman v. Pomainville (In re Pomainville)*, 254 B.R. 699, 705 (Bankr.S.D.Ohio 2000). Embezzlement is proven by showing that: 1) the creditor entrusted his property to the debtor, 2) the debtor appropriated the property for a use other than that for which it was entrusted, and 3) the circumstances indicate fraud. *Brady*, 101 F.3d at 1173; *Cash Am. Fin. Servs. v. Fox (In re Fox)*, 370 B.R. 104, 115–16 (6th Cir. BAP 2007). While embezzlement is more commonly observed in relation to money or funds, federal common law, which is applicable to determining dischargeability under § 523(a), recognizes that tangible personal property, including motor vehicles, may be embezzled. *See General Motors Acceptance Corp. v. Cline*, 2008 WL 2740777, 2008 U.S. Dist. LEXIS 109322 (N.D.Ohio 2008), *aff'd after remand* 431 B.R. 307, 2010 Bankr.Lexis 2562 (6th Cir. BAP Nov. 3, 2009) (embezzlement of automobiles); *Hynes v. Needleman (In re Needleman)*, 204 B.R. 524 (Bankr.S.D.Ohio 1997) (embezzlement of partnership property from a car repair business).

 To establish embezzlement under § 523(a)(4), Lawson needed to establish entrustment of the tractors to the Conleys, appropriation of the tractors by the Conleys for a use other than for which they were entrusted and circumstances indicating fraud.

The court will first discuss the ownership and entrustment issues relating to the Ohio conversion claim and the § 523(a)(4) nondischargeability embezzlement claim. The undisputed evidence was that Lawson

held title to and owned the 8726 Tractor, the 8800 Tractor and the 8815 Tractor prior to the Conleys having transferred title to those tractors to Port Diesel. The word "entrust" is defined as: "to give over (something) to another for care, protection, or performance." The American Heritage College Dictionary 468 (4th ed. 2007). Based upon Lawson's providing the 8800 Tractor to Betty under their business arrangement, Lawson entrusted that tractor to her and, that element is met as to the 8800 Tractor as to Betty Conley. Since Lawson did not entrust that tractor to James Conley, Lawson did not meet that element as to James Conley. On the other hand, Lawson entrusted the 8815 Tractor to James Conley. Lawson parked the 8815 Tractor at the Gallimore Road property with the Conleys' consent because zoning or other laws or regulations prohibited them from parking it at his property. James Conley used the Gallimore Road property with its garage as his place of business to repair commercial vehicles. By parking the 8815 Tractor at that facility, Lawson entrusted it to James Conley, since the evidence showed that property was under James Conley's ownership and control. No evidence was presented that Betty controlled that property. Thus, the court finds that Lawson entrusted the 8800 Tractor to Betty and the 8815 Tractor to James Conley.

The second element to establish embezzlement under § 523(a)(4) is the deprivation of Lawson's ownership or possessory rights in the tractors or the appropriation of the tractors for a use other than that for which they were entrusted. The Conleys' transfer of title to the 8800 Tractor and the 8815 Tractor and subsequent disposition of those tractors constituted the appropriation of those vehicles for purposes other than for which they were entrusted, which deprived Lawson of his ownership and possessory rights in those tractors.

Further, Lawson made a demand for return of those tractors, which was refused. *See* Exh. 17, 511. With respect to the 8800 Tractor, Lawson entrusted the tractor to Betty for use in the joint business venture—not to be sold to Leonard Smith. With respect to the 8815 Tractor, Lawson entrusted the tractor to James Conley for parking and not for sale to Mr. Smith. Accordingly, the appropriation and deprivation elements under § 523(a)(4) embezzlement were met as to Betty Conley with respect to the 8800 Tractor and as to James Conley with respect to the 8815 Tractor.

The third and final element to establish embezzlement is circumstances indicating fraud. As noted, there was no fraudulent intent or scheme on the part of the Conleys at the inception of the business arrangement entered into between Betty and Lawson to deprive Lawson of his tractors or other property. Betty and Lawson moved forward in the hope that the venture would be profitable for both of them. However, the court must determine whether the Conleys later conduct relating to the transfer of the titles to the three tractors and disposition of the 8800 Tractor and the 8815 Tractor amounted to circumstances indicating fraud. To make that determination, an understanding of Ohio's unclaimed motor vehicle statute, which provided the procedure through which the Conleys' transferred title to the 8726 Tractor, the 8800 Tractor and the 8815 Tractor to James Conley dba Port Diesel, is necessary.

### I. *Ohio Unclaimed Motor Vehicle Statute and the Conleys' Taking of the Tractors Under that Statute*

The Conleys sought to justify their conduct in transferring title to the three Lawson tractors and selling the two which Lawson did not recover under Ohio's un-

claimed motor vehicle statute, Ohio Revised Code § 4505.101 (the "Unclaimed Motor Vehicle Statute"). Lawson alleges that:

> In an attempt to gain lawful possession of Plaintiff's tractor/trailers, [the Conleys], through their company, Port Diesel Truck Services, fabricated outstanding mechanics' bills against [Lawson]. [Conleys], using these fabricated bills, filed a mechanics' lien and unclaimed motor vehicle affidavit with the state in order to gain title on Plaintiff's tractor/trailers.

Complaint (doc. 1, ¶ 13). Accordingly, a discussion of the Unclaimed Motor Vehicle Statute is in order.[14]

Under the Unclaimed Motor Vehicle Statute the owner of a repair garage or storage facility (the "Applicant") may obtain a certificate of title to a motor vehicle free and clear of liens if the following requirements are met:

1) The Applicant must be the owner of a repair garage or storage facility;

2) The value of the vehicle must be less than $2,500;[15]

3) The vehicle must remain unclaimed for at least 15 days following completion of the requested repair or the agreed term of storage;

4) The Applicant must send to the vehicle owner at the owner's last known address by certified mail, return receipt requested, a written notice to remove the vehicle;

5) The Applicant must have received the signed receipt from the certified mail or have been notified that the delivery was not possible;

6) The Applicant must make a search of the records of the bureau of motor vehicles for liens on the title to the vehicle;

7) If there are liens on the title, the Applicant must notify the lienholder by certified mail, return receipt requested, stating where the vehicle is located and the value of the vehicle;

8) The vehicle must remain unclaimed by the owner and any lienholder for at least 15 days following the mailing of the notices to the owner and any lienholder;

9) The Applicant must execute an affidavit verifying that all of these requirements have been satisfied, which affidavit must contain the following:

a) the value of the motor vehicle as determined in accordance with stan-

---

14. There is very little reported case law discussing this statute. In *State Farm Mutual Auto. Ins. Co. v. Advanced Impounding and Recovery Services, Ltd.*, 165 Ohio App.3d 718, 848 N.E.2d 534 (2006), an Ohio appellate court held that the procedure provided by the Unclaimed Motor Vehicle Statute could not be used to obtain title to a stolen vehicle impounded by an impounding service when the insurance company that paid its insured for the stolen vehicle offered to pay for the costs incurred from the time of its being notified of the impoundment.

15. While Ohio Revised Code § 4505.101 may appear to apply the $2,500 limit on the value of vehicles for which this procedure may be used to the gross value of the vehicle, the registrar of motor vehicles and the Ohio appellate courts allow the applicant's charges to be deducted from the NADA (National Automobile Dealers Association) or Red Book value in arriving at this $2,500 threshold. *See* the Unclaimed Motor Vehicle Affidavit form used by Betty, which appears to be the Ohio Bureau of Motor Vehicles' officially sanctioned form for transferring titles under this statute (Exhs. 25A, B, C, & D). *Matthews v. Mark Heflin Enters.*, 2012 WL 2410625, 2012 Ohio App. LEXIS 2532 (Ohio Ct.App. June 27, 2012) and *Comm Star Cmty. Star Credit Union v. Nickson*, 2007 WL 4554226, 2007 Ohio App. LEXIS 6189 (Ohio Ct.App. Dec. 28, 2007).

dards fixed by the registrar of motor vehicles;

b) the length of time the vehicle has remained unclaimed;

c) the expenses incurred with the vehicle;

d) that a notice to remove the vehicle has been mailed to the titled owner by certified mail, return receipt requested; and

e) that a search of the records of the bureau of motor vehicles has been made for outstanding liens on the motor vehicle; and

10) Upon receipt of the certificate of title, the applicant must pay to the clerk of courts for deposit into the county general fund the value of the vehicle, as determined in accordance with standards fixed by the registrar of motor vehicles, less expenses incurred by the applicant.[16]

Ohio Revised Code § 4505.101.

 The notices sent by Betty to Lawson and Clear Choice regarding the 8800 and 8815 Tractors failed to comply with the Unclaimed Motor Vehicle Statute. When a statute requires that written notice be provided before certain action can be taken, the written notice should substantially comply with the requirements of the statute. *Iliff v. Weymouth,* 40 Ohio St. 101 (1883); *Railway Co. v. Cronin,* 38 Ohio St. 122 (1882). In *Baker v. Kellogg,* 29 Ohio St. 663 (1876), the Ohio Supreme Court held that when a statute requires that a surety give written notice to a creditor to commence suit, that notice must contain an unconditional demand to commence suit and language that the surety "wish" that the creditor proceed with an action against the debtor was not sufficient to comply with the statute. The court noted that: "In view of the fact that the statute provides for the release of a party from a fixed legal liability—from the payment of a debt which he justly owes—its requirements should be at least substantially, if not strictly and literally complied with." *Id.* at 665. In *JP Morgan Chase Bank, N.A. v. Carbone,* 2008 WL 927777 (Ohio Ct.App. March 17, 2008), the court held that in order for a lien to trump an open-end mortgage holder's lien, the holder of that lien must provide the holder of the open-end mortgage with all of the information listed in Ohio Revised Code § 5301.232(D) and that actual notice of its lien, without the written notice being sent, was not sufficient to give the lienholder priority over subsequent advances made by the open-end mortgage holder. Similarly, in *Whitesides v. Mason,* 47 Ohio App.2d 173, 352 N.E.2d 648 (1974), the decision held that a notice to commence suit upon a mechanic's lien which described the wrong property and the wrong lien was not sufficient to void the mechanic's lien even if the mechanic's lien holder knew that the notice to commence suit intended to refer to the lien in question. Thus, the Ohio courts have required notices mandated by statute to at least substantially conform to the terms of the statute.

The notices sent to Lawson as the owner did not comply with Ohio Revised Code

---

**16.** The statute does not provide a process for the vehicle owner or any lienholder to recover the excess funds when the value of the vehicle exceeds the repair and storage charges and, accordingly, those funds appear to be forfeited to the county. In this case, the Unclaimed Motor Vehicle Affidavit for the 8800 Tractor showed a net amount of $1,225 that would have been required to be paid into the county general fund at the time that the title was issued to Port Diesel and the Affidavit for the 8815 Tractor showed a net $830 to be paid into the county general fund upon issuance of the title, but no evidence was introduced as to whether such funds were paid into the county general fund.

§ 4505.101. The notices dated June 4, 2009, signed by Betty on August 4, 2009 and sent to Lawson approximately August 4, 2009 failed to notify Lawson to remove the vehicles that were the subject of those letters. The notices are simple collection notices, stating: "THIS IS AN ATTEMPT TO COLLECT A DEPT (sic) ... there is an amount owed for ... for repairs[.][P]lease pay no later than 14 days to avoild (sic) further action." *See* Exhs. 15 & 17. As noted by Lawson in his post-trial brief, these notices "were only demands for payment to Port Diesel without itemization or receipts for parts and no verification that Mr. Lawson authorized the repairs (Tr. 16–19) ... [and did not include] a notice of sale or transfer of title or any court proceeding relating thereto (Tr. 20–21; 306–07)." doc. 84, p. 10. While the letters demand that Lawson pay within 14 days to "avoid further action," nowhere in these collection notices does it demand that or notify Lawson to remove the tractors, let alone notify him that the Conleys would be obtaining titles to the tractors if he did not pay the asserted charges. Further, the notices gave Lawson 14 days to pay, not the 15 days under the statute to remove the tractors.

█ These notices failed to give Lawson notice of the statutory procedure which the Conleys' purportedly were following to obtain title to the Tractors. The Unclaimed Motor Vehicle Statute requires specific notice to the owner of the vehicle to remove the vehicle and that title to the vehicle will be sought by the repair garage or storage facility if the charges are not paid and the vehicle removed within 15 days of the mailing of the notice. This conclusion is supported by the motor vehicle registrar's "Unclaimed Motor Vehicle Affidavit" completed by Betty to transfer titles to the three tractors to Port Diesel.

These Affidavits contain the following notice printed in bold typeface:

**\*IMPORTANT NOTICE TO CUSTODIAN\***

**The custodian hereby certifies compliance with all provisions of Section 4505.101 of the Ohio Revised Code. This includes notifying the owner, mortgagee or lien holder by Certified Mail (return receipt requested), of the repair/storage charges. Also, where the vehicle is located and that it must be claimed within fifteen (15) days from receipt of the notice "(has received the signed receipt from the certified mail or has been notified that the delivery was not possible)" or ownership will be forfeited and mortgage or lien shall be invalid. The custodian further certifies that the vehicle has remained unclaimed following notification and that a search of the Ohio Bureau of Motor Vehicles records has been made for outstanding liens on the vehicle before executing the unclaimed motor vehicle affidavit.**

*See* Exhs. 25B & 25D. The collection notices sent by Betty to Lawson in August 2009 demanding that the owner "pay ... to avoid further action" do not suffice to constitute such a notice because they did not: a) notify Lawson that the vehicles needed to be claimed within 15 days; and b) that ownership would be forfeited if they were not claimed with fifteen days. If the notice had notified Lawson that the Conleys dba Port Diesel intended to transfer the titles to the 8800 Tractor and the 8815 Tractor, Lawson could have instituted a replevin action or other appropriate action in a court to secure a judicial determination of the parties' rights. *See Caulkins v. Justine*, 1991 WL 43137 (Ohio Ct.App. March 27, 1991) (replevin action constitut-

ed a claim for vehicles when notice to remove cars sent pursuant to Ohio Revised Code § 4505.101).

■ For similar reasons, the notices to Clear Choice on the 8800 Tractor and the 8815 Tractor did not comply with the Unclaimed Motor Vehicle Statute. The statute specifically requires that the notice to the lienholder notify the lienholder of: a) the location of the vehicle; b) the value of the vehicle; and c) that if the vehicle is not removed within 15 days, the lien will be forfeited or invalid. The notices sent by Betty to Clear Choice in October 2009 failed to notify Clear Choice of these items. *See* Exhs. 14, 15 & 25B and 25D. Again, these notices only state:

> NOTE: This is an attempt to collect a dept [sic]. On or about June 16, 2009 Mr. Lawson order truck repair on 1998 Volvo VIN # 4vGWDAJH6WN748800. There is a balance due … as of Aug 5, 2009[.] Please no [sic] that there is a storage (daily) (20.00 per day) from Aug 5, 2009 to present. Please call Betty 937 486 5506 to settle this matter or please pay within 14 days of this notice to avoid further action.

In addition to not stating the location of the 8800 Tractor and the 8815 Tractor and their values, these notices also failed to notify Clear Choice to remove the Tractors and that the Conleys intended to obtain title to the Tractor if Clear Choice did not pay the asserted charges and remove the Tractor.[17]

The deficiencies with the notices Betty sent on behalf of James Conley dba Port Diesel were significantly more egregious

than trivial technical missteps. These notices were the statutory procedures sanctioned by the state of Ohio and were used by the Conleys to deprive Lawson of his property rights in the tractors. Courts must carefully scrutinize such self-help or extrajudicial remedies to ensure that private parties are not improperly stripped of their rights and property interests through color of law. Substantial if not strict compliance with statutes that permit individuals and entities to take other persons' property is necessary. Otherwise such procedures may be abused, resulting in deprivation of property interests without due process or fair notice. The notices sent by Betty were blatantly deficient because they failed to advise Lawson that his ownership interests (or Clear Choice that its lien rights) would be forfeited if the tractors were not claimed within 15 days—the exact purpose of the notice required by Ohio Revised Code § 4505.101.

Having determined that the notices sent under the Unclaimed Motor Vehicle Statute were deficient, the court will address whether there were circumstances indicating fraud to support nondischargeability under the embezzlement prong of § 523(a)(4) in relation to the Conleys' transfer of the titles to the tractors and the disposition of the 8800 Tractor and the 8815 Tractor.

The circumstances are:

a) Lawson and James Conley never had a payment dispute concerning James Conley's work on Lawson's trucks until Lawson sought to collect from

---

**17.** The court need not address whether Clear Choice would have had to pay the Conleys the asserted charges to obtain the Tractor since Clear Choice had a valid lien on the titles to the tractors, which trumps a mechanic's possessory lien. *See Commonwealth Loan Co. v. Berry*, 2 Ohio St.2d 169, 207 N.E.2d 545 (1965); *Thorp Credit, Inc. of Ohio v. Johnny's*

*Auto & Truck Towing, Inc.*, 9 Ohio App.3d 296, 459 N.E.2d 1313 (1983); *In re Cox*, 133 B.R. 198 (Bankr.N.D.Ohio 1991). Jordan, the principal of Clear Choice, raised this issue with Betty, but the Conleys chose to proceed with disposition of the tractors anyway. *See* Exh. 14, 396 (¶ 11) & 401.

Betty under their business arrangement;

b) Betty's unabashed intent was clear when she flouted to Jordan of Clear Choice that "possession was 90% of the law" and to Lawson that she was going to own the tractors;

c) The evidence established that the 8726 Tractor was one of the tractors which Betty was acquiring from Lawson and which Weber drove for her under Betty's arrangement with Lawson. Betty was responsible for the repairs and maintenance. Despite that, the Conleys, through the name Port Diesel, transferred title of the 8726 Tractor to Port Diesel under the guise that Lawson owed James Conley for repairs.

d) The Port Diesel invoices were never prepared until the dispute between Betty and Lawson erupted in full force. The invoices lacked any signature or work order approved by Lawson, any supporting documentation and contained little itemization or description as to the work performed. In addition, the invoices included charges for storage from the time that the work was allegedly ordered.

e) While the Conleys repeatedly testified that three other men repaired trucks at the Port Diesel garage owned by James Conley, including work on the subject tractors, none of these other individuals testified to support this assertion.

f) Despite the conspicuous notice on the Unclaimed Motor Vehicle Affidavits, Betty on behalf of James Conley dba Port Diesel, certified that written notice was provided to Lawson (and Clear Choice) of: i) the repair and storage charges; ii) the location of the tractors and iii) that ownership of the tractors and Clear Choice's liens would be forfeited if they were not claimed within 15 days. However, the only notices provided to Lawson (and Clear Choice) were hand-written collection notices stating the asserted repair and storage charges and demanding payment in 14 days "to avoid further action." The notice did not specify that the tractors needed to be removed within 15 days or their ownership interests and lien rights would be forfeited. The certifications on the Unclaimed Motor Vehicle Affidavits were intentionally false and used to deprive Lawson of his property under the color of law. Without such false certifications, the Conleys (through the fictitious name "Port Diesel") would not have been able to obtain title to the tractors and dispose of those tractors.

While the Conleys are not lawyers, they availed themselves of a statutory procedure, which, by itself, requires some degree of sophistication. If they were sophisticated enough to obtain a vendor's license for James Conley dba Port Diesel as the first step to transfer the titles to the tractors into the name of Port Diesel and then to complete the Unclaimed Motor Vehicle Affidavits to transfer the titles to the three tractors, they were sophisticated enough to know that they were making false certifications to the State of Ohio through which they wrongfully deprived Lawson of his tractors under the color of state law. The transfer of these tractors proves circumstances indicating fraud under the third requirement to prove embezzlement.

## V. Conclusion

The court awards Lawson judgment against Betty Conley in the amount of $6,000 under state law on account of her conversion of the 8800 Tractor and a sepa-

rate $6,000 judgment against James Conley under state law on account of his conversion of the 8815 Tractor and finds that the conversion of those tractors constitutes nondischargeable debts for embezzlement under 11 U.S.C. § 523(a)(4). The court is concurrently entering an order consistent with this decision. Interest shall accrue from the date of the entry of the judgment in accordance the federal judgment interest rate. *See* 28 U.S.C. § 1961.

**IT IS SO ORDERED.**